# CHARLESTON.

WATSON *v.* COAST *et al.*

SWEARINGEN *v.* WATSON *et al.*

Submitted September 4, 1891.—Decided December 19, 1891.

1. OPTIONS—EXECUTORY CONTRACT.

Where a written proposal for the sale of land, sometimes called an option, is dependent merely on acceptance within a fixed time, upon such acceptance and notice of it to the proposer within the time an executory contract is formed, with mutual obligations on the parties, as in other contracts.

2. OPTIONS—EXECUTORY CONTRACT.

Where a proposal requires acceptance "by wire or otherwise," the sending of a telegram of acceptance to the proposer by the other party, or personal verbal acceptance, is acceptance.

3. OPTIONS—EXECUTORY CONTRACT.

Where payment is not in such proposal made an act of accep-

| 35 | 463 |
| 35 | 744 |
| 35 | 463 |
| 39 | 156 |
| 35 | 463 |
| 42 | 541 |
| 35 | 463 |
| 45 | 383 |
| 35 | 463 |
| 54 | 339 |
| 54 | 340 |
| 35 | 463 |
| e56 | 164 |
| 56 | 170 |
| 56 | 171 |
| 56 | 173 |
| 35 | 463 |
| 61 | 482 |

tance or required to be made within the time fixed for acceptance, payment or tender within the time is not essential to the formation of a contract, but only an element in the performance of it.

### 4. OPTIONS—PAYMENT.

If such option does not otherwise provide, payment in cash is to be made simultaneously with transfer of title. The obligation to make payment and the obligation to make title are mutual and dependent, and neither can be demanded until the other is ready to be performed.

### 5. OPTIONS—EXECUTORY CONTRACT—PAYMENT.

Ordinarily, time of payment is not of the essence of an executory contract for the sale of land; not more so under a contrat so formed under such proposal than in other executory contracts. The injury from delay is adequately compensated by interest on the purchase-money.

### 6. OPTIONS—PAYMENT—SPECIFIC PERFORMANCE.

A purchaser entitled to good title need not pay purchase-money until he gets good title. If he decline to receive a deed and pay purchase-money alleging defect of title, on grounds plausible enough to cause a prudent man to hesitate, though turning out to constitute no defect, this will not defeat his right to specific performance. Herein such contract so formed under such proposal is included.

*J. J. Jacob* for appellant, Swearingen, cited 4 W. Va. 107; 23 W. Va. 480; 28 W. Va. 1, 14, 15; 29 W. Va. 250; 14 Pet. 77; Fry Spec. Perf. §§ 164, 173; 31 W. Va. 9; 21 Gratt. 463; 29 Gratt. 714; 3 Leigh 235; Id. 381; 2 Pom. Eq. § 755; 24 Gratt. 475; 5 W. Va. 339.

*Caldwell & Caldwell* for appellee, Coast, cited 1 Bradw. 153, 158; 31 W. Va. 736, 744; Fry Spec. Perf. (1871) § 166; 1 Sto. Eq. Juris. § 736 b. Wat. Spec. Perf. §§ 414, 419; 33 W. Va. 749; 35 W. Va. 40; 29 W. Va. 245; Pom. Eq. Juris. §§ 367, 368 (note 1), 372, 1406; 5 Kan. 615; 10 W. Va. 677; 1 Hilly. Vend. § 1; 5 Laws. Prop. Right § 2231; 1 Benj. Sales (Corbin) § 38; 129 Mass. 383; 1 Pick. 520; 2 Allen 193; 2 Chitt. Cont. (11th Am. Ed.) 1022; 1 Id. 140; 19 W. Va. 440, pt. 12 Syll.; 26 W. Va. 469; 31 W. Va. 77; 18 W. Va. 513; 2 Sto. Eq. Juris. § 1531; 16 W. Va. 651; 20 W. Va. 398, 410; Id. 415; 26 W. Va. 469; 3 Pom. Eq. Juris. 442; 1 W. Va. 543; 34 W. Va. 49; Wat. Spec. Perf. 614; 24 Ill. 617; 1 Perry Trusts § 82; 1 Johns. Ch'y 590; 31 W. Va. 9, 13; Sugd. Vend.; 78 Va. 707; 46 Ill. 279; Wat.

Spec. Perf. (1881) § 153, n. 2, 32 W. Va. 614, 625; 21 Miss. 391; 19 W. Va. 240, 251.

BRANNON, JUDGE:

W. S. Watson took seven leases of lands in Hancock county for the purpose of boring for oil and gas. He had the assistance and personal influence of B. F. Swearingen with the land owners in procuring these leases, for which Swearingen, as he contends, was to have a one fourth interest in the very right conferred by the leases on Watson, while Watson contends that Swearingen was to have only a one eighth interest, and that not in the right or estate conferred by the leases, but only in their proceeds, if sold, or in proceeds of oil produced, with full right and power in Watson to sell the leases themselves, or rather the estate conferred by the lease contracts. In order to put down a test well, Watson assigned a one half interest in these leases to W. R. Evans, and Evans assigned one fourth to one Hoag, and Hoag assigned the same to W. F. Coast. Evans proceeded to put down this test well. It developed the presence of oil, but was not what is called among oil men a lucrative producer. It was closed up. While such was the condition Watson and Coast began negotiations for the sale by Watson to Coast of Watson's remaining one half interest in the leases, resulting in the execution by Watson of the following proposal or option in writing:

"TORONTO, February 18th, 1889.

"Memorandum of agreement by and between W. S. Watson, of the first part, and W. F. Coast, of the second part. For the sum of twelve hundred and fifty dollars I hereby agree to sell and transfer all my one half interest in certain leases and oil well situated in Hancock county, West Virginia, providing the said Coast of the second part accepts the same at the above mentioned price, by wire or otherwise, on or before Wednesday, February 20th, 1889, and before 7 o'clock P. M. of the same day. If not accepted as provided, this agreement is null and void.

"Witness E. W. FRINK.      W. S. WATSON."

This was delivered to one Willoughby for safe keeping.

About two o'clock P. M. of 20th of February, Coast sent the following telegram :

"TORONTO, O., Feb'y 20, 1889, 1:50 P. M.

"To W. S. Watson, Beaver, Pa. :

"Will take property. Meet me at Toronto first train. Answer. W. F. COAST."

Watson at the telegraph office at Toronto, before seven o'clock of the 20th of February, saw and read the original of this telegram, and on same date about half past two o'clock Coast met Watson at Toronto and told him he would take the property, and Watson signified his assent by saying " all right." As there was no bank at Toronto Watson and Coast agreed to go to New Cumberland, which was close, where there was a bank, to get money to make payment, but it occurring to them that it was after bank hour, they agreed to meet at New Cumberland next morning, Watson making his attendance there conditional upon the condition of his wife's health allowing his absence from her. The next morning Coast went to New Cumberland, and made arrangement with the bank to furnish him cash to pay Watson the price of the transfer of the interest in the leases ; but Watson telegraphed him that he could not leave home, and then Coast went at once to Beaver, Pa., where Watson resided, and there made arrangements with a bank to furnish him money to pay Watson the twelve hundred and fifty dollars. Coast while inspecting the said well before sending the telegram to Watson, heard in an indefinite way of Swearingen's claim, from a notice posted on the derrick at the well and information from Swearingen's brother, and called at Swearingen's house, but obtained no information from him, and sent word to Swearingen to meet with them at New Cumberland next day ; and there on 21 February, through one Ball representing Swearingen, learned of the character of Swearingen's claim and that he could establish it by two witnesses besides himself, and had the advice of an attorney 'that if such were facts as Ball stated them, Swearingen had an interest in the estates under the leases.

Later on that day Coast met Watson and Watson's attorney at Beaver, and Coast stated Swearingen's claim, and

that he was ready to pay Watson the purchase-money but was unwilling to do so, unless secured against Swearingen's claim. He demanded an indemnifying bond, but Watson refused to give any further than to cover the portion of the twelve hundred and fifty dollars going to Swearingen for his one eighth of the proceeds of sale, as he Watson claimed Swearingen's right to be. Several propositions were mentioned as expedients for obviating Swearingen's claim, none proving satisfactory. Coast when refused the bond said he would fall back on his rights under his original contract. All propositions discussed were, from the evidence of all, only expedients suggested in an effort to obviate the obstruction arising from Swearingen's claim.

The whole evidence shows that Coast was ready and able to pay the money, but demanded a clear title, or indemnity; Watson insisted that Swearingen had no interest save one eighth in the proceeds of sale. Thus on the 22d of February the parties dispersed. But at breakfast at the hotel on 23rd Coast indicated to Watson's attorney Nelson, that he would buy the undisputed one fourth interest at six hundred and twenty five dollars, and Watson secure him for shooting well No. 1 and boring other necessary test wells to secure the leases, which being communicated to Watson by his attorney, Watson telegraphed Coast, "If proposition to Nelson can be put in satisfactory shape, would accept it. Meet us at Hotel Boyer to night." They met at Hotel Boyer accordingly.

They differed as to securing expenses incurred in drilling future wells, Watson and Nelson insisting that such security should extend to shooting the well already drilled and drilling one more, Coast asking security as to one on each lease necessary to secure it. Upon the failure to accomplish anything Coast declared that he would fall back on his original rights. A few minutes later Watson produced the deeds of lease and tendered them to Coast, offering to transfer them, if paid, but Coast declined. Still later, on 25 Feb'y, 1889, Coast sent Watson this telegram:

"Will accept your proposition. Take one quarter at six hundred and twenty five dollars, and secure me for drilling No. 2 well and expenses of shooting No. 1 well. Answer."

This was the proposition Watson and Nelson had made to Coast at Hotel Boyer on 23rd. On Feb'y 26 Watson telegraphed Coast as follows: "This and all other propositions by me you rejected. Have no other to make, except the title to half of the property invests in me and is for sale."

Thus all negotiations ended.

Coast on 20th Feb'y purchased an oil tank for operation on the leased land, and in a few days went into possession and has bored wells and obtained oil in paying quantities and is yet engaged in operations on the premises. On 23rd Feb'y he obtained from Willoughby the said written option, told him he had accepted the option and was thus entitled to its possession, and on 26th February, after Watson had telegraphed him that all propositions were at an end, he obtained the affidavit of Frink, the subscribing witness to the option, to its execution so as to record it, and on 4th March, 1889, he had the option recorded, and notified Swearingen in writing on 19 Ap'l, that he had bought Watson's interest and recorded the option; and on 30 Ap'l, he tendered Watson twelve hundred and fifty dollars purchase-money under the option, accompanied by a demand for a good title, but Watson declined it.

On 26 June, 1890, B. F. Swearingen instituted a chancery suit in the Circuit Court of Hancock county against Watson, Evans, Coast and others, setting up a one fourth interest in said leases, setting forth a sale by Watson to Coast of a one half interest in said leases, and also Coast's and Evans interests under the sale of half by Watson to Evans; and setting up that five wells had been drilled on the premises by Evans and Coast and oil taken therefrom, without account to Swearingen, and praying that Evans and Coast disclose their contracts with Watson, and render an account of oil produced, and averring his superior right to Coast, asked specific performance of Swearingen's contract with Watson by a conveyance of a one fourth interest to Swearingen.

On 4 Oct., 1889, Watson brought a chancery suit in the Circuit Court of Hancock county against Coast, Evans and Swearingen, by his bill alleging his title under said leases,

stating and recognizing his sale of a one half interest to Evans, but claiming to be owner of the remaining half, notwithstanding the sale of that half to Coast under said option, which he set forth in his bill but repudiated on the theory that the option had never been accepted by Coast, and so had never become a contract investing Coast with any interest in the leasehold estate; setting up the pretensions of Swearingen, but maintaining that he had, and never had, any interest in such leasehold estates, but only a one eighth interest in their proceeds, if sold, or of the proceeds of oil sold; alleging that Evans and Coast had bored five or six wells and produced oil in large quantities and sold it; and praying that the cloud upon his title arising from the pretension of Coast be removed, and his title to said leases, especially the three on which said wells had been bored, be adjudged valid and still subsisting, and that an account be taken of money received by Coast and Evans from oil sold, and he be decreed his share thereof.

Coast answered insisting upon the said option and his acceptance of it as making a valid contract conferring upon him a one half interest in said leases, declaring his readiness and willingness to pay the purchase-money when he should get a good title; and he brought with his answer and paid into court twelve hundred and seventy five dollars and forty two cents, the amount of the purchase-money going to Watson under the sale with interest to the filing of the answer.

By a decree entered on 10th November, 1890, the Court decided that the sale from Watson to Coast by said option was binding, and provided for its specific enforcement by transfer from Watson to Coast of a one half interest in the leases; and decided that Watson, notwithstanding his agreement with Swearingen, retained the right to sell the entire interest in the leases, or any part thereof, and decreed him one hundred and sixty two dollars and eighteen cents, the one eighth of the fund in Court in full satisfaction of his right, and to Watson the remainder, less certain costs.

Swearingen appeals to this Court.

It will answer no purpose for the understanding of the

case or for use as a precedent to detail the evidence covering more than four hundred large printed pages of the record. It is very conflicting on many points material in the decision of the case. An opinion of Judge Paull delivered when deciding the case in the Circuit Court is before us, and we think it expresses a clear and correct view of the case.

The first question I shall consider is, do the written offer or option made by Watson and the telegram sent to him by Coast constitute a contract?

Looking at this offer it conveys a clear distinct proposition; looking at the telegram it conveys an equally clear and distinct acceptance of that proposition. From this proposition on the one side and its unqualified acceptance on the other, results a complete contract according to the well established law of contracts. "If one makes to another an offer, verbal or written, direct, by letter, or by telegram, of a sort implying nothing to be done except to assent or decline, and the latter accepts it, adding no qualification, there is thus constituted a mutual consent to the same thing at the same time; in other words, a contract. And the question of the sufficiency of the transaction to work this result is of law for the court." (Bishop, Contr. § 322. See *Weaver* v. *Barr*, 31 W. Va.; *Barrett* v. *McAllister*, 33 W. Va. 738; Pomeroy Contr. § 169; 3 Am. & Eng. Ency. Law, 841.)

Such being the law, the papers in this case exactly fit it; a plain enforceable proposal, a plain acceptance, neither narrower nor broader than that proposal, and unconditional. What arguments are made against the existence of such contract? 1st. It is said that the option was delivered to Willoughby as an escrow. If so, what was the condition annexed to it as an escrow? Certainly no condition antagonistic to the theory of a complete contract is shown; and if it exist, it ought to be shown. Three witnesses say that it was handed Willoughby to be given to Coast, if he accepted within the time limited in it, and if not accepted, to be destroyed; while Watson says it was not to be delivered to Coast in any event. This shows that no condition connected with its delivery to Willoughby made it an escrow in law in his hands, but that he was a mere custodian hold-

ing it for safe keeping, there being no duplicate. Where an instrument is left with a third party to be delivered and become operative upon the happening of an event, it is an escrow; but according to Watson himself no such condition was' imposed, and according to Coast, Frink and Willoughby it was to be handed to Coast upon his acceptance within the time. It really was not an escrow. It spoke its own condition; there was no condition to its operative effect that it did not itself contain; and according to these witnesses the only condition connected with its delivery by Willoughby to Coast is the same one expressed by the option, and that was filled by the telegram of acceptance. A good deal is said about Coast's *fraudulently* obtaining possession of the instrument by representing to Willoughby that he had accepted the option. I think he had right to it after this acceptance as an evidence of his right. But this is of no importance. What matters it who has the paper? The question is, what is the effect of the paper, no matter who has it.

2nd. It is urged that Coast was to pay cash before a contract was born.

Here we must not confuse things that are separate and distinct; we must not confound things which pertain to the performance of a contract with those things which pertain to the making of a contract. First, we must have a contract to be performed before we get to performance; but when once we have a contract, then we can talk about performance. It is true that a proposer, as he can prescribe absolutely the terms of his proposal, may make acceptance and payment within the time limited essentials of the contract; he may make payment the very act of acceptance, or may require any acts, payment among them, within the period essential to the consumation of the contract under the proposal, provided he so word his proposal. As he dictates his proposal, so must be the acceptance, since to make a contract the acceptance must be as broad as the proposal, unconditional and include all its terms without modification.

The majority of the Court in *Weaver* v. *Burr*, 31 W. Va. 736, construed the cash payment in the option in that case

as an act by it required to be done within the limit, the option having prescribed cash payment as part of the terms, further providing that the parties should have the privilege of buying the "property at said price, and on said terms, for sixty days," thus including, as three judges thought, cash payment within the sixty days. But here cash is not mentioned. The only thing required to be done within the limit assigned in the option is acceptance, that is, the expression by Coast of his assent to the proposal in the mode indicated by the option. Then occurred the *aggregatio mentium*, the coming together of the minds of the parties upon the same thing, thus making the contract. Nothing further was necessary to the existence of the full blown contract than notice of acceptance, which was given by wire and in words as the proposal prescribed.

Thus we have a contract. It is not necessary to talk longer about things that pertain to the making of that contract. Cash payment is not one of those things. It pertains to the performance of this contract. It is a very material element in its performance, but immaterial in its making. I do not say that because this proposal is silent as to the payment, cash could not be required; for the law would imply that cash must be paid before transfer, or simultaneously with transfer of title; but I do say pre-payment was not a precedent condition to the coming into existence of the contract. There is nothing peculiar in a unilateral contract or a proposal on one side, offering property for sale, if accepted within a given time, from other contracts. Where parties do not meet and at once both consent to the contract, an offer runs for a reasonable time, unless limited, and when accepted, it is performed like any other contract which leaves anything undone. So with such option. When the proposal is accepted, it becomes a contract, just like any other contract. So far as relates to those acts which are by the proposal made acts of acceptance, or are to be done within the limited time as part of its terms, they must be done within it; but wherein they are not so required to be done within the limit, they do not concern the making but only the carrying out of the contract. How can we say here that payment was an act of

acceptance when not so specified, not even named ? It could not have been contemplated as the act of acceptance, to be made within the limit, for the option allows Coast to accept by telegraph when distant from Watson.

Having thus a contract it simply remained for the parties or the law to execute it according to its terms, and so far as it does not prescribe, as prescribed by law; and the matter of payment is in this case as in ordinary cases of executory contract. The covenant or obligation to pay and that to pass title are mutual and dependent; the one can not be required before the other is ready to be performed. *Barrett* v. *McAllister*, 33 W. Va. 738; 2 Minor Ins. 779; 2 Lomax Dig. 47; *Roach* v. *Dickinson*, 9 Grat. 154.

A purchaser is not bound to pay the purchase-money for real estate until a good title free from cloud which may disturb the purchaser shall be made to him, unless the contract otherwise provides. (*Tavenner* v. *Barrett*, 21 W. Va. 681, 657; 2 Minor 791; *Goddin* v. *Vaughn*, 14 Gratt. 102.)

As oil and gas within the soil are part of *corpus* or body of the land and real estate, and the leases here conferred the right to take them for one year and as much longer as they should be found in paying quantities, they likely passed real estate not mere license and at any rate required deed to confer legal title. (1 Lomax Dig. 2; *Mining Co.* v. *Petroleum Co.*, 57 Pa. St. 83; *List* v. *Cotts*, 4 W. Va. 543.)

Even though a purchaser knows at the time of his purchase of a defect of title, unless otherwise provided, he is entitled to demand a good title before payment. (2 Minor Ins. 792; 3 Pom. Eq. § 1405.) A contract or agreement to sell land implies a covenant on the part of the vendor to convey a good title, unless it be otherwise in it stipulated. *Rucker* v. *Lowther*, 6 Leigh 259; *Tavenner* v. *Barrett*, 21 W. Va. 657, 681.

The claim of Swearingen, as it was presented to Coast, and as it was developed by evidence taken in this case, was a danger hovering over the title sufficient to make any purchaser fear, and justify him in withholding purchase-money. It is true this claim in the end under judicial decision turns out to be such as not to impair Coast's title under his purchase; but as the payment of purchase-money

was not an element in the making of the contract, but only in performance of it, delay in making it could only be considered by the court in exercising its discretion in decreeing specific performance; and generally such delay does not defeat such relief, as any injury from it is adequately compensated by payment of purchase money with interest. Where a contract for the sale of real estate is, in its nature and circumstances, unobjectionable, it is as much a matter of course for equity to decree specific performance as it is for a court of law to give damages for its breach; and time is not, ordinarily, considered as of the essence of the contract, and especially as to payment of purchase-money. (*Abbott* v. *L'Hommedieu,* 10 W. Va 677.)

The doctrine that time is not material is applicable as well to unilateral as bilateral contracts. Speaking of these unilateral contracts or options, by which now-a-days so much property is sold, and which have come into so great practical importance, Pomeroy, in his work on Contracts, § 387 says: "Where the contract is really an offer on one side, with a provision that this offer must be assented to and accepted, when a mere acceptance is contemplated, or payment must be made, when payment was the act of acceptance contemplated, at or before a specified date, then, of course, the act of assent or payment must be done within the prescribed time, and time is from the very form of the contract essential. If, therefore, a vendor agrees to convey, if payment be made at or before a given date, or if an option is given which is to be accepted by payment within a given time, then the time of payment is certainly essential; in fact payment is a condition precedent to the vesting of any right in the vendee. If, however, the offer or option requires an assent and acceptance within a given time, such assent must be made within the time prescribed, and the contract thereby becomes concluded and mutual; but whether time is essential with respect to its subsequent performance, must depend upon its object or the nature of its subject-matter."

Delay in payment does not entitle a party to rescind when there is a cloud rendering title suspicious. (Waterman Spec. Perf. § 419; 22 Gratt. on p. 101.) Our attention

is called to § 335 of 1 Benj. Sales (Corbin's Ed.) saying: "The seller may elect to keep the property as his own on default of payment, unless he has waived his right." The author adds, "This applies to sales to be paid for by note or cash; and where no time is fixed, the law implies that the terms are cash on delivery." This is unquestionably the law of performance of sales of personalty. Delivery is the act in sales of personalty which, generally, passes title and the ultimate act in the process of performance; and in cash sales can not be demanded before payment; but neither can payment be demanded unless the other party is ready to deliver, for "where nothing has been said as to payment, the law presumes that the parties intended to make the payment of the price and the delivery of the possession concurrent conditions." (Benj. Sales § 676 by Bennett.) So in case of sales of realty, the delivery of the deed passing title can not be demanded before payment, nor payment before the delivery of deed, for payment of purchase-money and delivery of deed are mutual and dependent covenants. But failure to pay does not show there is no contract; and in this case we are to decide whether there is a contract. In this case we are dealing with such an interest issuing out of land as requires a deed for transfer of title.

In connection with the above passage from Benjamin, counsel for appellant says, "no doubt the reason the paper was handed Willoughby was the understanding that in no event was Coast to have any right until he paid the purchase price." This is simply inference, and against the evidence; for no one says there was any condition of payment annexed to the deposit of the paper with Willoughby. It is also here urged that Frink acting for Coast on 20 Feb'y 1889, sent Watson a telegram to "come on first train to close deal;" but the words "close deal" do not mean to close contract in the sense of making contract, but meant the transaction, the payment of money and transfer of right under a contract already made by proposal, acceptance, and notice thereof.

It is maintained by appellant's counsel, that Coast always intended to make his acceptance of the proposal conditional upon the removal of the cloud arising from Swearingen's

claim, and that this is shown by the fact that when Watson and Coast met on 20th February, Coast knew of that trouble and discussed it with Watson.

The telegram already sent was an acceptance, on the strength of which Watson could have held Coast bound to perform, for it was unconditional and Watson had right to take the acceptance as according to the terms of his offer (Lawson's Prop. Rights, § 2231; 6 Am. St. R. 122). Coast could not hold back a secret mental reservation against the square language of his telegram. We can not say he intended to do so. He would not be allowed to contradict his writing by evidence of such condition (*McGuire* v. *Wright*, 18 W. Va. 513). It may be that as against Coast, if he later that day in personal interview with Watson made a conditional acceptance—qualified his telegraphic acceptance—it could be said there was no contract; but Coast and Frink both pointedly contradict Watson as to this, the Circuit Court has found for Coast on this conflict, and I think properly on a preponderance of the evidence and probabilities. Whilst Coast on the premises had intimation of Swearingen's claim, he had called on Swearingen and failed to receive any information as to it, and had been told by Watson prior to that date that if he heard any claim set up by any one to disregard it, as it was a mere personal claim against him; and the fair conclusion from the evidence is, that it was not until after Coast had, in an interview on 21st February, with Ball, Swearingen's representative, and the advice of a lawyer as to its seriousness that he gave any notice or importance to it, or made its removal a condition before payment.

If on 20th February Coast gave such importance to it, why did he express willingness to pay at once? and, moreover, Watson dispensed with payment that day and postponed it. As showing that Coast intended to accept the proposal, and had not made, and did not intend to make the removal of the Swearinger claim a condition of his acceptance, we may refer to his purchasing a tank for operations on the premises on the very day of acceptance, his procuring the affidavit of the subscribing witness to enable him to record the proposal, his recording it and his

notifying Swearinger of his purchase, all close in time to the acceptance. He did insist on the removal of, or indemnity against, the Swearinger claim before payment, but not before acceptance.

Several days after the acceptance of the option, on 23rd February, Watson and his lawyer produced the leases to Coast and offered to transfer them on payment of one thousand two hundred and fifty dollars. Why did they do this, if there was no acceptance, no contract?

A distinct section of the brief of appellant's counsel is, that the answer of Coast is indefinite so that it is difficult to say whether he claims the contract was executed and passed title or merely excutory; but that in no point of view can it be regarded an executed contract. That depends upon the sense in which we take the word "executed." If in the sense of "made," then it is an executed contract; if in the sense that it has not been carried out by payment and transfer of title, or that it does not pass *legal* title, the proposition is correct, it is not an executed, but an executory contract; yet it confers an estate and right in equity.

An agreement to sell and convey land, but which is not a conveyance operating as a present transfer of legal estate and seisin, is at law wholly executory, and produces no effect upon the estates and titles of the parties, and creates no lien or charge on the land itself. The seller remains, *to all intents*, owner of the land; he can convey it to another free from any legal claim, or can devise it, and on his death it descends to heirs. The contract does not interfere with his legal rights to the land, and he is simply liable to the duty of performing it, or paying such damages as a jury may award for not doing so. The vendee acquires no interest or property; he can maintain no action for its recovery; his right is a mere thing in action to recover from the vendor damages for breach of the contract, and his duty is to pay the stipulated price, and both this duty and right on his death pass to his personal representative. The relations between the parties are personal. Until a deed of conveyance is delivered no estate passes from vendor to vendee. But the principle that equity regards that as done which ought to be done is disclosed in clear light by the

manner in which it deals with such executory contract, in complete contrast with the view of it held at law. Equity in some respects and for some purposes views the contract as only executory just as at law; but so far as the interest in the land is concerned, it is regarded as executed and as operating to transfer the estate from the vendor and vest it in the vendee. By the contract the land ought to be conveyed to the vendee, the purchase price ought to go to the vendor; equity regards these as done; the vendee as having acquired the land, the vendor the price. Equity looks upon the vendee as owner of the land; an equitable (though not a legal) estate has vested in him commensurate with that provided by the contract. Though the vendor is yet vested with the legal estate, he holds it as trustee for the vendee, and has a lien on the land, though in the possession of the vendee, for his purchase-money. And in equity the vendee may sell, incumber or devise it, and on his death it goes to his heirs. And equity will enforce against the vendor the performance of his contract by compelling him to pass the legal estate. Pom. Eq. Juris. §§ 367, 368. The same author in n. 1 to § 368 says: "It is a great mistake, opposed to fundamental notions of equity, to suppose that the equity maxim does not operate, and the vendee does not become equitable owner until and as far as he has actually paid the stipulated price. This erroneous view has sometimes been suggested, and sometimes even held in a few American decisions, but it shows a misconception of the whole equitable theory. In truth the vendee becomes equitable owner of the land, and the vendor equitable owner of the purchase-money, at once, upon the execution and delivery of the contract, even before any portion of the price is paid."

These doctrines apply to unilateral offers which have become contracts by acceptance, as well as to ordinary contracts.

The negotiations of the parties on several days after Coast's acceptance of Watson's offer have no bearing on the gist of this case, which is, whether Coast is entitled to specific performance of the contract constituted by that offer, its acceptance and notice of acceptance; for those ne-

gotiations were only abortive efforts to avoid the difficulty of Swearingen's claim, or attempted compromise, or substitution of one contract in the place of the other by Coast's accepting half of what he contracted for. These matters are all *post* the making of the contract, relating to its performance, or something substitutionary. Coast never abandoned his rights or accepted anything in substitution of them. He declared his purpose to rely on his contract, and by recording the proposal, giving notice to Swearingen, making tender and going on with operations, and other conduct evinced from the 20th of February down a constant claim under said contract.

I have prolonged this opinion to undue length in deference to the able counsel of appellant in a desire to refer to the points made in his brief.

Before a court of equity it does not strengthen Watson's claim that he waited until October, 1889, before suing, Coast going on developing the property, and suing for the leases, especially those on which development had occurred as his prayer reads in his bill; nor does it weaken Coast's case that he has spent large sums and developed oil in large quantity. To refuse specific performance to Coast would be hard and disastrous, for which he would be no further responsible than for a refusal to pay in view of a cloud which was apparently serious, which, as MARSHALL, C. J., said in *Garnett v. Macon*, 4 Call. 367, presented to a prudent man " might have serious influence on his conduct," and for which Swearingen was more than any one else responsible; while to Watson interest on his purchase-money is all he can equitably ask.

I come now to the second question in the case. Did Watson have power to sell the leases and pass a good right as against Swearingen, whatever Swearingen's interest was, whether in the very estate created by the leases, or only in the proceeds of their sale or of oil produced? That he had an interest nobody questions; but what kind of interest, and whether an eighth or a fourth, are points of great controversy, and upon them the evidence is greatly conflicting; but as to the question whether Watson was to have full power to sell, the evidence while conflicting is not so

much so as on the other points just indicated, the preponderance being in favor of the theory adopted by the Circuit Court as expressed in the decree, that Watson retained the right to sell and dispose of the entire interest in the leases, or any part thereof.    Watson's evidence is that he retained or had such power, and Evans testifies positively that some time after 19th October, 1888, Swearingen told him that his interest went with Watson's; that whatever Watson did with his interest his (Swearingen's) went with it.    Swearingen denies this.    The circumstances strongly sustain the finding of the Circuit Court herein.    The leases were to be, and were taken solely in Watson's name.    They were taken from 15th to 19th October, 1889, but no paper was executed by Watson to Swearingen for any interest.    It would have hampered the facility of sale.    These oil leases are generally taken for sale again in speculative enterprises.    The evidence shows a sale was comtemplated.    Watson was pecuniarily unable to bore wells on each, or perhaps one, of these seven leases to save them from forfeiture under the leases requiring development in short time, and the purpose of the parties must have been, not to develop themselves, but to sell.    These circumstances, too, tend to show that Swearingen was to have an interest, not in the oil property itself, but in its proceeds.    There are several witnesses who speak of hearing Watson say that Swearingen had an "interest" in the leases, but whether his right was merely one to a share of the proceeds derived from the leases or in the property would in conversation be indifferently spoken of as "an interest," and affords little light when we come to the precise question of the kind or character of that interest.    The decree legally speaking is a denial that Swearingen had an interest in the very estate conferred by the leases, and is expressly that he had an eighth, not a fourth, in the proceeds, and in these respects the evidence is conflicting.    Under these circumstances we can not reverse the decree.    It is therefore affirmed.

AFFIRMED.