(No. 23029.

THE NORTHERN ILLINOIS COAL CORPORATION, Appellee,
*vs.* ELIZABETH CRYDER *et al.* Appellants.

*Opinion filed June 18, 1935.*

BABCOCK, GILRUTH, BECK & McCONNELL, and S. J. HOLDERMAN, (THOMAS C. McCONNELL, ALFRED BECK, and C. GRAYDON MEGAN, of counsel,) for appellants.

KIRKLAND, FLEMING, GREEN & MARTIN, (JOSEPH B. FLEMING, WILLIAM WILSON, and JOSEPH H. PLECK, of counsel,) for appellee.

Mr. JUSTICE HERRICK delivered the opinion of the court:

In the circuit court of Grundy county the Northern Illinois Coal Corporation filed its second amended complaint, subsequently amended, for specific performance and other relief, against Elizabeth Cryder and her children, the spouses of such as were married, the Morris Coal and Mining Company, a corporation, Carl R. McElvain and Ralph C. McElvain. Upon issues joined the cause was tried by the court without a reference to the master in chancery. A decree was entered granting the relief sought, and the record is brought here for review on the appeal of the defendants.

Elizabeth Cryder, a widow, had a dower interest and her six children owned the fee in the farm of approximately 108 acres which is the subject matter of this litigation. She and three of her children lived upon the premises. On October 25, 1930, Mrs. Cryder, her children and the spouses of such as were married, in consideration of the payment of $1000, executed and delivered to Ray S. Weimer, the superintendent of the plaintiff, and his assigns, a written option to purchase the farm for $23,000 at any time within twelve months thereafter. The option was subsequently by the payment of $1000 extended to October 25, 1932, and later, by a writing executed by all the original optionors, was again extended to October 25, 1933, in consideration of a further payment of $1000. On October 30, 1931, Weimer assigned in writing all of his interest in the option to the plaintiff. The plaintiff paid

the two payments, severally, of $1000 made subsequent to October 25, 1930, and Mrs. Cryder received such money. It was provided by the terms of the option that the several payments made therefor were, in the event of the purchase of the premises, to be applied on the purchase price of $23,000. The option, except as modified by paragraph 5 thereof, hereinafter set forth, provided that $21,000 of the purchase price was to be paid by the assumption of and agreement to pay, according to the terms thereof, a mortgage on the premises in the principal sum of $21,000 to the Dighton-Dilatush Loan Company, the optionee to pay interest thereon accruing from the date of the delivery of the deed. This mortgage was later assigned to the Equitable Life Assurance Society, hereinafter called the Equitable. The fourth paragraph of the option provided as follows:

"Party of the first part further agrees that upon the request of the party of the second part, its nominee, successor or assign, it will furnish to party of the second part, its nominee, successor or assign, an abstract of title, certified down to date showing good merchantable title in the party of the first part to the premises above described, subject only to the mortgage above set forth, and allow party of the second part, its nominee, successor or assign, a reasonable time for examination of the same."

The fifth paragraph, so far as pertinent or important to the issues, is here set forth:

"Party of the first part further agrees that upon notification of the party of the second part, its nominee, successors or assigns, that it has elected to buy said premises, said party of the first part will sell and convey to said party of the second part, its nominee, successors or assigns, the above described premises by good and sufficient warranty deed, subject to the then existing encumbrance, and containing the conditions above set forth and if such party of the second part agrees to assume and pay as part of the purchase price herein, the encumbrance hereinbefore and hereinafter referred to it being expressly understood and agreed that if any portion of such encumbrance is paid whereby the existing encumbrance is less than twenty-one thousand

($21,000.00) dollars, then first parties shall receive in cash the difference between the amount of the existing mortgage and the amount of twenty-one thousand ($21,000.00) dollars," etc.

The contract recited that any payment to be made by the optionee "may be paid to Grundy County National Bank, Morris, Illinois, to the credit of party of the first part."

On October 10, 1933, the plaintiff, through its duly authorized attorney, Frank W. Young, by mail notified Mrs. Cryder that it had elected to exercise its option, and requested her to obtain the abstracts of title and to deliver the same to Young's office in Morris or forward to the plaintiff's office. The next day Mrs. Cryder, accompanied by one or two of her sons, went to Young's office. There was a conversation between the attorney and Mrs. Cryder about the contemplated sale. Mrs. Cryder stated to him, "I see the company is finally going to take my land," to which Young responded, "Yes." The parties discussed the matter of concluding the sale and the details thereof. Mrs. Cryder was told by Young it would be necessary to obtain an abstract of title to the property and that she should employ a lawyer to protect her interests. The Cryders employed Roger Clark, an attorney at Yorkville, to represent them in completing the sale. On November 9, 1933, abstracts of title to the premises were delivered to the plaintiff. The abstracts were voluminous. The plaintiff's attorneys in Chicago examined the abstracts and found objections to the title. The opinion setting forth the objections was delivered to the Cryders' attorney. Continuations of the abstracts showing the objections cured were delivered to the plaintiff about December 26, were examined by the plaintiff's Chicago attorneys on December 28 and title was approved on December 29. On December 10 the Cryders employed an attorney at Morris to advise them as to their rights under the contract with the plaintiff. This employ-

ment was advanced to the position where the Morris attorney represented the Cryders generally in all matters then pending connected with the sale of the lands in question. Neither Clark nor the plaintiff had notice of such employment until about December 26. On that day the Cryders' attorney at Morris told Young that he was in the Cryder matter and inquired the status of the pending sale. Young told him substantial objections made to the title were in process of being cured and the plaintiff was ready to proceed in accordance with the contract.

The mortgage hereinbefore mentioned was a lien on other lands of the Cryders in addition to the lands here involved. As to who requested the plaintiff to pay off this mortgage prior to the closing of the sale became a controversial issue in the case. The Cryders claim that it was the plaintiff's request that it be permitted to make payment, while the plaintiff contends the Cryders asked the company to make the payment, and, as supporting the reasonableness of their request, relate that the Cryders stated, in effect, that they desired the payment made so as to remove any personal liability that the Cryders might have upon the note in the event it remained outstanding and the ultimate failure of the plaintiff to pay the note secured by the mortgage; also, the Cryders wanted the mortgage released because it covered other lands owned by them. The matter of the payment of this mortgage was a subject of frequent discussion among the parties. There was correspondence by both parties with the Equitable with reference to whether the company would receive payment of the mortgage and where payment could be made. From the evidence in the record we are of the opinion that the Cryders insisted the plaintiff take up the mortgage, procure a release thereof, and deliver such release and the Cryders' note at the time the sale was closed.

The evidence shows that the plaintiff received definite word from the Equitable on January 6, 1934, that it would

accept payment of the mortgage debt, that the amount necessary to liquidate the obligation was $16,732.67, but the Equitable refused to accept payment any place other than at its New York office. The Cryders were notified of this fact. Different methods of making payment of the mortgage were discussed, one of which was that money should be brought to Morris, but nothing was definitely agreed upon prior to the 10th of January as to how or where the payment should be made by the plaintiff to the Equitable.

Many of the events touching upon the final negotiations relative to closing the contract of sale are in dispute, but from a careful examination of the record we believe the evidence fairly tends to establish the following: On January 6, 1934, Kane, vice-president of the plaintiff, telephoned from plaintiff's Chicago office to Young that Kane would come to Morris the first part of the next week to close the Cryder sale, and if no plan had been worked out he would bring all the money to Morris. Kane had before that time been informed by Young that he thought any plan by which the Cryders would be assured that the mortgage would be taken up when the sale was consummated would be satisfactory to the Cryders' attorney at Morris. Young within a short time communicated to Cryders' attorney at Morris the conversation just had with Kane. Kane telephoned Young on January 8, advising him, in effect, that due to the pressure of other business matters it would be impossible for Kane to be in Morris before Wednesday or Thursday and to inform the Cryders' attorney to that effect. This message was communicated on the same day to the Cryders' attorney, and he stated, in substance, that the arrangement would be satisfactory. On Wednesday, the 10th, Kane telephoned Young he could not come to Morris on that day but would be there on Thursday, and further informed him that Senne, of the law firm of Kirkland, Fleming, Green & Martin, plaintiff's attorneys in Chicago, had suggested that the plaintiff turn over to them the amount due

on the mortgage, with instructions to transfer the funds to their New York office for the purpose of purchasing the Cryder note from the Equitable. Following this conversation Young called the Cryders' attorney and related the conversation just had with Kane. The Cryders' attorney approved the arrangement. Young then called Kane on the telephone and told him that the arrangement was satisfactory to the Cryders' attorney. While it is a controverted issue in the case, the ·evidence tends to prove that later on this same day Kane communicated by telephone with Young, and Kane told him he had delivered the check for the amount of the mortgage to the plaintiff's Chicago attorneys, and that he then had in his possession a letter from that firm, addressed to the Cryders' attorney at Morris, which acknowledged receipt of the amount required to satisfy the mortgage to be sent to their New York office to purchase the note, and Young communicated this message the same day to the Cryders' attorney, who stated, in effect, that such method was acceptable.

On January 11 Kane came to Morris. Young notified the Cryders' attorney that Kane was in his office ready to close the Cryder sale, to which the Cryders' attorney replied, in substance, that he did not know whether the matter would be closed—that they were having trouble with some of the heirs. Later in the day, pursuant to a written notice given by the plaintiff to the Cryders' attorney, Kane, Young and the Cryders' attorney at Morris met at the Grundy County National Bank. On this occasion the plaintiff tendered to the attorney for the Cryders $3267.33 and delivered to him the letter from the Chicago attorneys, the substance of which has been recited, and demanded a conveyance of the premises. The tender was refused and no deed delivered. There is a dispute as to what was said on that occasion. The weight of the evidence tends to show that the Cryders' attorney stated some of the Cryder

children did not want to go through with the deal, but he thought within two or three days they would get in line and complete the deal.

The evidence also tends to show that after January 11 there was some communication between the attorneys for the different parties in which the Cryders were told the tender was still available and was being kept good but that the Cryders declined to perform the contract. The facts developed on the trial disclose that about the 5th of January the Cryders were in communication with the McElvains. The defendant Ralph McElvain is president and a brother Carl is secretary and treasurer of the Morris Coal and Mining Company. On January 10, 1934, the Cryders made and delivered a written contract whereby they sold to Ralph McElvain the premises in controversy. This contract was in evidence. Reference was made therein to the Weimer option, and a copy of such option was attached to the Mc-Elvain contract. The McElvain contract *inter alia* provided for a payment of cash in hand of $3000 and a deposit of $8000 as an indemnity to the Cryders against any loss which they might sustain by reason of the cancellation of the plaintiff's option. By its terms McElvain also indemnified the Cryders against any expenses or costs that might accrue out of any litigation with Weimer or the plaintiff. McElvain was also granted the power to carry on all negotiations for settlement and to control any litigation with Weimer or the plaintiff that might arise out of the rescission of the plaintiff's option. After the tender and demand of performance were made by the plaintiff on January 11, later in the afternoon of that day a written notice was served upon the plaintiff, signed by the Cryders. This notice was not addressed to the plaintiff but to Ray S. Weimer, and recited that because of his failure to comply with the terms of the option of October 25, 1930, and the extension thereof, the Cryders had elected to terminate the option. On the trial of the case the plaintiff offered in

evidence the Cryder mortgage and note, which had been assigned by the Equitable to the plaintiff under date of January 23, 1934.

The principal error assigned is that the decree of the court is contrary to the law and the evidence, and in support of such assignment numerous alleged sub-errors are argued.

It is urged by the defendants that the option was a unilateral contract; that there was no acceptance of the option in accordance with its terms, and in order to create a valid exercise of the option the plaintiff was required to notify each of the optionors of its election to buy the premises and tender the purchase money at the Grundy County National Bank on or before October 25, 1933. An option, so long as it remains unaccepted, is a unilateral writing lacking the mutual elements of a contract, but when accepted by the optionee there emerges, as the result of such acceptance, an executory contract *inter partes,* with the optionor as the vendor and the optionee as the vendee, for the sale and purchase of the optioned property, mutually binding upon the optionor and optionee and containing mutual rights and obligations enforceable as such in accordance with the established rules relating to executory contracts. *Pennsylvania Mining Co.* v. *Martin,* 210 Pa. 53, 59 Atl. 436; *Breen* v. *Mayne,* 141 Iowa, 399, 118 N. W. 441, 443; *Fulton* v. *Messenger,* 61 W. Va. 477, 56 S. E. 830.

It is earnestly argued by the defendants that under the provisions of the option the optionee was not only required to exercise the option within the period fixed by its terms but was compelled within the same time to tender the purchase price. It is not controverted that timely notice of the acceptance of the option was given by the optionee. Time is not, in words, made the essence of the option, but the general rule is, as related to the acceptance of an option, that time, whether so stated in express language or not, is the essence of the option. We must go to the option

to determine what are its terms and provisions upon the notice of acceptance. In determining the meaning of its words we are governed by certain general rules. One definite rule is to ascertain the intent of the parties from the instrument in the light of the language employed and the surrounding facts and circumstances attendant upon the transaction. *Breen* v. *Mayne, supra.*

While some confusion has arisen in the adjudicated cases with reference to time being the essence of contracts of the type here before us, yet we believe it has been occasioned by failure to differentiate between the provisions pertinent to the exercise of the option, by which acceptance it has been converted into an executory contract, and those relating to its performance. (James on Option Contracts, sec. 914, p. 442.) It is obvious that when the option contract here was accepted by the optionee certain obligations were thereby imposed upon the optionors, among which was the duty of the optionors, upon request, to furnish an abstract of title, certified to date, showing good merchantable title in the optionors to the premises, subject only to the lien of the $21,000 mortgage, and allow the optionee a reasonable time for the examination of the abstract; also to furnish the optionee with information as to the amount, if any, by which the mortgage debt had been reduced, in order that the optionee might know the amount to be paid to the optionors to conclude the purchase of the premises. The ordinary rule relative to performance is, that time is not the essence of an executory contract unless so made by the terms of the instrument, or by proof of circumstances establishing that time was regarded as a controlling element of the agreement. (*Boston and Worchester Street Railway Co.* v. *Rose,* 194 Mass. 142, 80 N. E. 498; *Stanley* v. *Gannon,* 109 Misc. 611, 180 N. Y. Supp. 602.) Another generally recognized principle in the interpretation of contracts is, that if the contract be regarded as ambiguous or uncertain, the practical construction of the

contract, as shown by the acts of the parties thereto, is persuasive of the true construction to be accorded the contract. *Nelson* v. *Colegrove & Co. State Bank,* 354 Ill. 408; *Wright* v. *Loring,* 351 id. 584; *Armstrong Paint Works* v. *Continental Can Co.* 301 id. 102, 108; *Atlas Portland Cement Co.* v. *American Brick Manf. Co.* 280 Pa. 449, 124 Atl. 650; *Crolius* v. *Lorge,* 192 Wis. 130, 212 N. W. 253; *Henion* v. *Bacon,* 100 App. Div. 99, 91 N. Y. Supp. 399.

If there were any uncertainty as to the meaning of those phases of the instrument, the acts of the defendants following receipt of the notice of election to purchase clearly demonstrate that not until an opportunity arose to sell the property to another did the defendants seriously consider that the optionee was not complying in spirit, as well as literally, with the terms of the contract. The furnishing of the abstracts of title by the vendors; the examination thereof by the plaintiff; the return of the abstracts by the plaintiff to the optionors with the opinion of the plaintiff's attorney explicitly pointing out the objections to the title; the obtaining of the proofs, making the same matters of record and the reproduction of the same on the abstracts for the purpose of obviating the objections; the discussions and negotiations following the acceptance of the option by the parties relative to the payment or assumption of the mortgage—all followed the orderly and usual sequence of similar transactions until the sudden refusal of the vendors to complete the sale. The tender of the purchase price was not made a condition precedent by the option contract. Time was the essence of the option but was not of the essence of the performance of the contract. The delivery of the deed and the payment of the purchase price were dependent covenants which were to be fulfilled concurrently. (*Greengard* v. *Bernstein,* 343 Ill. 416; *Breen* v. *Mayne, supra; Pennsylvania Mining Co.* v. *Martin, supra; Grey* v. *Nickey Bros.* 271 Fed. 249; *Watson* v. *Coast,* 35 W. Va. 463, 14 S. E. 249;

*Casto* v. *Cook,* 91 id. 209, 112 S. E. 502; *Byers* v. *Denver Circle Railroad Co.* 13 Col. 552, 22 Pac. 951; *Horgan* v. *Russel,* 24 N. D. 490, 140 N. W. 99; Pomeroy on Specific Performance of Contracts, (3d ed.) sec. 388, p. 824.) It follows that the contract was to be performed within a reasonable time after notice of its acceptance.

The next crucial question for determination is whether the notice of acceptance on the part of the plaintiff, addressed and delivered to Elizabeth Cryder alone, was sufficient. We have heretofore called attention in the statement of facts to some of the activities of Elizabeth Cryder in the making of the original option and the events following. To those heretofore related may be added that the $8000 check required to be given by way of indemnity under the McElvain contract was payable to her order. The evidence tends to establish that she was the dominant person in employing the attorneys at Yorkville and Morris to represent the Cryder interests in the consummation of the sale. Shortly prior to March 17, 1932, she called at the office of Young and told him she was confronted with the necessity of raising funds with which to pay interest accruing on the mortgage and desired the plaintiff to advance $245.50 on the next year's option. The plaintiff granted her request. A check for that amount, endorsed by her, was deposited to her personal account in the bank and she presumably used the money for the purpose for which it was obtained. The check for the balance due for the extension of the option for the next current year was received by her and deposited in her personal account at the bank. She attended to the paying of the taxes and interest on the mortgage and collected and disposed of the rents from the property. In November, 1933, she procured a quit-claim deed from her children and their spouses conveying the property to herself in order to facilitate the closing of the sale when the time should arrive for its conclusion. At about this time, accompanied by her son and her attorney,

Clark, she brought this deed to Young's office in Morris and there delivered the deed to him. Maurice Cryder, a son who lived in Morris, testified he did not sign the deed. Neither Mrs. Cryder, her other 'children nor any other person corroborated his testimony. The record shows that Clark and Young examined the deed and checked the signatures and that the signature of Maurice Cryder was subscribed to the deed. The deed remained in Young's hands until shortly after Christmas of 1933, when Edwin Cryder called for and obtained the deed. The defendants' attorney at Morris testified he received the deed from Clark on January 5, 1934, and that he had since made a thorough search for the deed and was unable to find it. Our conclusion from the evidence is that the recollection of Maurice Cryder on the subject of whether he signed the deed is not dependable, and we find from a preponderance of the evidence that he did sign such deed.

The contract here on the part of the vendors was a joint and not a several undertaking. There is authority that where notice is required to be given to contractors jointly liable, notice to one of the joint obligors is sufficient. (*Tevis* v. *Ryan*, 233 U. S. 273, 58 L. ed. 957; *Detlor* v. *Holland*, 57 Ohio St. 492, 49 N̦. E. 690; *Morse* v. *Aldrich*, 42 Mass. 544; 46 Corpus Juris, 563.) But we prefer to base our decision on this branch of the case on another ground. Obviously, under the record Mrs. Cryder was the "managing heir" of the premises, and held herself out, with the· knowledge and consent of the other owners of the premises, as their agent, with full power to attend to the business matters connected with and growing out of the Weimer option. Where the principal knowingly permits another to hold himself out as his agent and the agent in that capacity exercises authority, the principal is bound to the same extent by the authority assumed and exercised, with the apparent authority of the principal, as by the authority actually granted. And this may relate to a series of

transactions as well as to a single transaction. 1 Mechem on Agency, (2d ed.) sec. 246; *Faber-Musser Co.* v. *Dee Clay Manf. Co.* 291 Ill. 240; *Union Stock Yard Co.* v. *Mallory, Son & Zimmerman Co.* 157 id. 554; *Rockland-Rockport Lime Co.* v. *Leary,* 203 N. Y. 469, 97 N. E. 43.

It is well to remember that the option did not prescribe the form of the notice of acceptance nor require it to be in writing. If the question as to the sufficiency of the notice addressed to and delivered to Mrs. Cryder alone were debatable, it is settled contrary to the defendants' contention by the making and delivery of the quit-claim deed to Mrs. Cryder, which deed, according to the evidence, was for the purpose of enabling Mrs. Cryder more easily to complete the sale and transfer of the title to the plaintiff. By the making and delivery of such deed for the purpose stated, the children of Mrs. Cryder and their spouses severally admitted the validity of the service of the notice of acceptance of the option served upon her. The act of making and delivering such deed was also a ratification and approval of her actions in the conduct of the negotiations up to the time of the vesting of the title in her by such deed, and also might well be taken as evidence of her prior authority to act in the premises. *Neenan* v. *Industrial Com.* 329 Ill. 48; *American Car Co.* v. *Industrial Com.* 335 id. 332.

The McElvain contract, signed by all the Cryders and the spouses of those married, as the second parties, stated the following:

"Whereas the Northern Illinois Coal Corporation of which the said Ray S. Weimer is an employee *did serve notice upon said second parties of its election to take said premises before the expiration of said option and the extension thereof* but have not completed the purchase of said premises at the time of the ensealing and delivery hereof."

If there were any question as to the sufficiency—which there is not—of the service of the notice on Mrs. Cryder

as the representative of all the optionors, this recital was an admission, not by inference but is a direct, positive and unequivocal admission by each and every of the optionors, that the service of the notice on Mrs. Cryder was a valid and legal service on each optionor of the election to exercise the option on behalf of the plaintiff. It also condemns the complaint attempted to be lodged against the notice that it did not properly describe all the premises included in the option. It also is an estoppel against the Cryders from now being permitted to deny the form or sufficiency of such notice and is a waiver of any alleged defect or insufficiency in the plaintiff's election of performance. *Noble v. Chrisman,* 88 Ill. 186, 198; *Bondy v. Samuels,* 333 id. 535, 545, 550; *Rothschild v. Title Guarantee and Trust Co.* 204 N. Y. 448, 97 N. E. 879; *Crolius v. Lorge, supra; Henion v. Bacon, supra; Kean v. Story & Clark Piano Co.* 121 Minn. 198, 140 N. W. 1031.

We hold that Mrs. Cryder was the "managing heir" of the other optionors and had full authority to receive and accept notice that the optionee elected to exercise the option granted to it, and that the service upon her alone of the notice of election was sufficient.

Other contentions are made by the parties. Of these, the principal one remaining is the charge that a new contract was created by the optionee and Elizabeth Cryder by which the plaintiff was to pay the $21,000 mortgage, release the same of record and surrender the note made by the optionors at the time the sale was consummated. The Cryder children claim that such arrangement created a new contract; that if their mother made or caused such change to be made she was acting for herself, alone, and without authority of the children, and there can be no specific performance granted of the new contract. The record discloses no negotiations directed towards the execution of a new contract. The terms of the bilateral contract required the plaintiff to assume and pay the debt represented by the

mortgage. The liability of the plaintiff to pay the mortgage debt was, as between the optionors and optionee, absolute and fixed by the bilateral instrument. The undertaking was a promise that was enforceable. If the optionors were compelled to pay the debt, they in turn could require the plaintiff to reimburse them under the terms of the contract. The plaintiff could, with the consent of the mortgagee and without consulting or obtaining the consent of the optionors, pay the debt at any time before maturity. The time at which the payment was to be made was incidental, only, to the original undertaking. The plaintiff, by agreeing and arranging, at the request of Mrs. Cryder, even if she was acting for herself alone, to pay the debt before maturity and at the time the trade was closed, did not create a new contract materially different from the original bilateral contract between the parties. By paying the debt before maturity the plaintiff was merely doing what it had a right to do without the consent of the optionors.

The defendants charge that in executing the instrument of October 25, 1930, they were misinformed as to its contents, and charge the plaintiff's attorney at Morris with misconduct professionally. A careful review of the record discloses no merit in this complaint and there is no basis for the accusation.

The Statute of Frauds is urged as a defense against the enforcement of the contract. The parties sought to be charged here signed and delivered the writing sought to be enforced, so that the Statute of Frauds has no application in that view of the case, and inasmuch as we hold no new contract was created by the plaintiff consenting to taking up the mortgage before maturity, the Statute of Frauds would have no application to that phase of the cause. The instrument of October 25, 1930, with the extensions and the acceptance thereof by the plaintiff, constituted a valid and enforceable contract. The general rule is, that where the plaintiff has on his part made a conscientious effort fully

and fairly to comply with his contract specific performance will be granted. *Macy* v. *Brown*, 326 Ill. 556.

The other errors argued have been considered and found not to be well taken. The equities of the cause are with the complainant, (*Richter* v. *Schuett*, 314 Ill. 127, 139; *Hungerford* v. *Behrends*, 308 id. 406; *Vincent* v. *McElvain*, 304 id. 160;) and it is entitled to the relief prayed.

The chancellor properly held that the contract should be specifically performed, and accordingly the decree of the circuit court is affirmed.

*Decree affirmed.*