(No. 15131.—Reversed and remanded.)

CHARLES RICHTER et al. Appellants, vs. JOHN SCHUETT
et al. Appellees.

*Opinion filed October 28, 1924—Rehearing denied Dec. 3, 1924.*

1. FRAUD—*fraudulent transaction should be rescinded upon discovery of fraud.* A person who has been defrauded will not be permitted, after he learns of the fraud, to stand inactive and fail or refuse to execute his option to rescind the fraudulent transaction until future events determine whether or not it will be to his interest to rescind.

2. SAME—*when it is too late to rescind exchange of real property on ground of fraud.* Parties to an exchange of real property who have entered into possession of the premises and conducted a business thereon will not be permitted to rescind the transaction because the business is not as profitable as represented to them, where they wait nine months after discovery of the fraud before offering to trade back the property and where no claim of fraud is made until the other parties have brought suit to foreclose a trust deed given to secure a note made in the course of the transaction.

APPEAL from the Circuit Court of Cook county; the Hon. OSCAR M. TORRISON, Judge, presiding.

RANKIN, LUSTFIELD & LANDISE, (ODE L. RANKIN, of counsel,) for appellants.

GEORGE E. BRANNAN, (JOSEPH F. NOVOTNY, JEROME J. SLADKEY, and LEE WALKER, of counsel,) for appellees.

Mr. CHIEF JUSTICE DUNCAN delivered the opinion of the court:

On September 5, 1918, appellants, Charles Richter and Frances Richter, his wife, and Charles J. Wolf, trustee, filed their bill in the circuit court of Cook county to foreclose a trust deed on real estate known as 2731 West Lake street, in Chicago, (herein referred to as the Lake street property,) to secure a note of John Schuett and Bertha Schuett, his

wife, appellees, for $1000, and also to foreclose a chattel mortgage on certain personal property, etc., used for saloon purposes and located in the Lake street property, given to secure another note of the Schuetts for $1000. The Schuetts on January 18, 1922, filed an amended answer and an amended cross-bill. Complainants filed their answer to the amended cross-bill and issues were joined. By their cross-bill appellees prayed for the cancellation of the trust deed, chattel mortgage and the notes; also of a deed from the Richters to appellees conveying the property mortgaged by the trust deed, and of a deed from the Schuetts to appellants conveying lots 12, 13 and 14, in block 1, in Marsh's subdivision of the southeast quarter of the northeast quarter of ,section 16, township 39, north, range 12, east of the third principal meridian, situated in the village of Bellwood, Cook county, Illinois, and herein referred to as the Bellwood property. On September 26, 1922, a decree was rendered in accordance with the prayer of the cross-bill and dismissing the original bill for want of equity. This is an appeal from that decree.

In 1910 the Schuetts moved to Bellwood and purchased the Bellwood property, which contained about an acre and a half of land, for $800. They bought a small three-room house on an adjoining farm and moved it onto the Bellwood property. For this house, two horses, a cow, some hogs and farm implements they paid $700. A few years later they improved the Bellwood property by adding to the house a second story and a summer kitchen at a cost of $1100, according to the Schuetts. They also built a barn on the property at a cost of $300. This property is located about a mile from the principal part of the village of Bellwood and there is no other residence near it. About 200 feet from the property is a business establishment which deals in second-hand brick and is known as "the dust factory." Dust from the factory flies over the Bellwood property and settles on clothes when washed and hung out to dry and on the

grass. A creek runs near it, and in times of heavy rains the water stands on about a quarter of an acre of the land. Schuett and his relatives built the barn and the additions to the house on Sundays and at odd times. According to the Richters the house was set on railroad ties, the windows did not fit and there were no locks on the doors. The house had a hole under it, called a basement, but was not cemented. At the time the Schuetts started to improve the Bellwood property, in 1912, they applied for a loan at the Citizens State Bank of Melrose Park and were loaned $600. The president of that bank, Charles J. Wolf, trustee under the trust deed, stated that he valued the property at that time, considering the improvements to be made, at not more than $1500. He fixed the value of this property in March, 1917, at $1750. The house, after it was improved, was insured for $1500 by the Schuetts through Wolf, who testified that he had instructions not to insure property against fire loss for more than three-fourths of its value. The house burned down in 1918 and something over $1400 was collected as insurance by the Richters, the then owners, before the foreclosure proceedings were begun. There is no further evidence in the record as to the value of the Bellwood property except the value placed on it for the purposes of the exchange of the two properties by the Richters and the Schuetts. There was a mortgage on the property for $300, held by the Citizens State Bank of Melrose Park, when it was traded to the Richters.

The Lake street property is located in the middle of a block, just opposite Fairfield avenue where it runs into Lake street. Both the elevated and surface cars run in front of it. The lot is 25 feet by about 90 feet and has a two-story brick building on it which is the width of the lot and about 54 feet long. There is also a barn on the rear of the lot. The brick building has a cement basement under it which extends out under the sidewalk built over it, with iron and glass for light under the walk. The walk cost $700. The

314—9

first story is a business room and the second story is a flat
of seven rooms and a bath-room. There is a bakeoven and
a bakehouse in the basement for baking bread. The build-
ing has two plate-glass show windows in front and a front
partition, with an arch over the door opening into the saloon.
The lot cost the Richters $1500 in about 1890 and $200
more to clear up tax sales. They built the two-story brick
building on the lot in 1891 at a cost of $4200. The lot and
building were incumbered by what is referred to as the
Greenebaum & Sons building loan for $3200 shortly after
construction of the building. According to the testimony
of the Richters the building was remodeled in 1913 by put-
ting a steel ceiling in the saloon and installing electric lights
in the building. A new hardwood floor was put on top of
the old floor and new skylights were put in three rooms up-
stairs. The back porch was re-built, new waste pipes were
put in the kitchen, a new bath tub, toilet and washstand were
put in, and also hardwood stairs. On March 19, 1917, when
the Lake street property was traded by the Richters to the
Schuetts, there was a $2000 mortgage on the property, held
by the Greenebaum Bank. The Richters claimed that this
property had brought a rental of $50 per month previous
to the last named date.

There is a very marked conflict in the evidence as to the
state of the condition of this building and as to the market
value of the Lake street property on March 19, 1917. The
population in the neighborhood of the property was largely
colored people, and some colored people lived next door to
it. The evidence for the Schuetts is to the effect that the
roof was in bad repair and leaked; that the plaster on the
second floor was loose; that the floor of the first story was
about worn out; that when it rained the basement became
flooded, and that the general appearance of the property
was aged and neglected. Two real estate dealers testified
for the Schuetts that the value of the property was not to
exceed $3000 on the last date aforesaid, and that property

in the neighborhood of the same general character had sold for less than $3000. Two real estate dealers testifying for the Richters placed the value of the property at $5000 or more. Charles H. Pfingsten, a real estate appraiser for the Greenebaum Sons Bank and Trust Company, which at the time of the transaction in question held a mortgage on the property for $2000, testified that he inspected the property in July or August, 1917, with a view to ascertain its value for the purpose of renewing the loan to the Schuetts and that he then valued it at $5000, and that it was his opinion that that was the fair market value of the property in March, 1917.

The Richters and the Schuetts entered into a contract on March 19, 1917, for the exchange of properties, whereby the Richters were to convey to the Schuetts the Lake street property in exchange for the Bellwood property. The Lake street property was deeded by the Richters subject to the $2000 incumbrance. The Bellwood property was also conveyed to the Richters subject to the $300 mortgage on that property, but the Richters received, in addition to the Bellwood property, two cows, a lot of chickens, and other personal property, which the parties valued at $300, and in consideration of this personal property being transferred to them the Richters assumed the $300 incumbrance on the Bellwood property and agreed to pay the same. At the time of the contract for the exchange of properties Mrs. Frieda Fendt and her husband occupied the Lake street property as tenants, having previously purchased the saloon fixtures and the personal property used in connection with the saloon from the Richters. There was at that time an unexpired saloon license, under which the Fendts were operating the saloon, that cost $2400, $1300 of which had been advanced to the Fendts by the Richters, as the Fendts were unable to advance all the money. Fendt had deserted Mrs. Fendt and she was running the saloon, and the Fendts were still owing the Richters a part or all of the $1300 which

they had advanced the Fendts. The understanding between the Richters and the Schuetts was, that this saloon license, which expired on May 1, 1917, was to be transferred to the Schuetts, or at least they were to be allowed to operate under that license until it expired, and it was so arranged. On the day of the exchange of properties Richter bought the saloon fixtures, and the personal property that went with them, of Mrs. Fendt and paid her therefor $500, less a small amount of rent and interest that the Fendts owed the Richters, and paid her by check a sum over $400. The Schuetts in their trade with Richter also bought the saloon fixtures, and the personal property that went with them, from the Richters for the sum of $500, and this $500 they were to pay is a part of the consideration for which the note, and the chattel mortgage securing it, were executed. The Schuetts received from Mrs. Fendt a bill of sale for the saloon fixtures, etc., on the day they exchanged property with the Richters. On the same day the Richters and the Schuetts went to the Citizens State Bank of Melrose Park and had proper deeds drawn for the exchange of the properties, and the trust deed, chattel mortgage and notes aforesaid, by Charles J. Wolf, the president of the bank, and executed them all before him as a notary public, except the chattel mortgage, which was acknowledged before a justice of the peace in Melrose Park. Afterwards Mrs. Fendt turned the saloon and the Lake street property over to the Schuetts and the Richters took possession of the Bellwood property.

By their answer and cross-bill the Schuetts admit the execution of the trust deed, the chattel mortgage and the notes, but they attack their validity on the ground of fraud, and in their cross-bill pray for the rescission of the contract and the cancellation of the documents connected therewith. They also make the claim that there was a confidential relation existing between Richter and them of which he took advantage in the negotiation of the transactions, and that they trusted him implicitly and relied upon him completely,

which facts he well knew, took advantage of the same and by fraudulent representations swindled them out of their property. One of their contentions is that he told them the Lake street property was reasonably worth the sum of $7000 but that in the deal he would value it at the sum of $5000; that the saloon fixtures, etc., were reasonably worth $1000 but that he would charge them only $500 for the same, and that in the exchange he would take their property at $3000; that, as a matter of fact, in the deal the Lake street property was put in at the value of $5500, the saloon fixtures at $1000, the Bellwood property at $2500, and that the documents were executed accordingly without their knowledge. Their other contention is that the Richters made fraudulent representations as to the value of the Lake street property and as to the receipts and profits of the saloon business, well knowing the falsity of such representations and well knowing that the Schuetts were illiterate and ignorant and knew nothing about the saloon business and the value of the property traded to them and trusted them implicitly to deal with them fairly and truthfully. On the other hand, the Richters contend that the Schuetts made full investigation of the property traded to them and relied on others for information as to the volume of the saloon business and the probable profits of the same; that as to the deal, Richter told them that the Lake street property was worth $7000 and the saloon fixtures $1000, that the license then in force had cost $2400, of which sum he had advanced $1300, and that in the deal he would only charge them $5500 for the Lake street property, $500 for the saloon fixtures, etc., $500 for the unexpired license, and would value the Bellwood property at $2500; that all the documents were executed accordingly with the knowledge of the Schuetts, and that the notary who drew the papers informed them fully that the documents were so drawn; that he made no false representations whatever as to the property or the business and that all his representations made to them were true.

According to the contentions of the Richters the $100c note secured by the trust deed represents the actual difference in the value of the Lake street property, less the $2000 incumbrance thereon, and the value placed by the parties on the Bellwood property, or the difference between $3500 and $2500; and according to the same contentions the $1000 note secured by the chattel mortgage was given for the amount the Richters paid Mrs. Fendt for the saloon fixtures, which was $500, and for the additional amount of $500 for the unexpired license.

There was a trial before the chancellor and a jury, questions being previously formed and submitted to the jury for their answers under the instruction of the court. The jury found, in substance, in answer to four questions, that the Richters did practice fraud upon the Schuetts in the negotiations for and the exchange of their respective properties; that the Schuetts were induced to make the exchange of properties by reason of the fraudulent representations aforesaid; that they were induced to sign the notes and mortgages by reason of the fraud practiced upon them, and that they have not affirmed the transactions after full knowledge of the fraud. The court refused to set aside the verdict of the jury on motion of the appellants and rendered the decree aforesaid against them.

The court found in its decree the following facts, in substance: The Schuetts are simple, trusting, illiterate persons, unable to read or write the English language. Richter is a man of considerable business experience and has held the offices of director of a school district, village trustee for Bellwood and precinct committeeman of the Chicago ward. For many years prior to March 19, 1917, the Schuetts and Richters were neighbors and on very friendly terms. Richter looked after and assisted and advised in the transaction of a large part of the business of the Schuetts, so that they learned to depend upon and trust him and repose confidence in him in all transactions in the management of their prop-

erty. Richter, knowing this, induced them to enter into the contract by means of the following false, fraudulent and material representations: That the Lake street property was reasonably worth the sum of $7000, when, in fact, the fair and reasonable market value thereof was not more than $3000, which he well knew; that Mrs. Fendt was making money in running the saloon and occupying the premises, when, in fact, she was losing money and had lost in the business over $4000 in the preceding four years; that there was sufficient stock on hand in the saloon to permit the Schuetts to conduct it from thirty to sixty days without further buying, when he well knew that the supply was only sufficient for three or four days; that he was allowing them $3000 for their Bellwood property and was valuing the Lake street property at $5000 in the transaction, when he well knew he was allowing only $2500 for the Bellwood property and charging them $5500 for the Lake street property; that the Schuetts were receiving the saloon fixtures, etc., and the license, for the sum of $500, when, in fact, he was charging them therefor $1000. The court further found that at the time of the transaction the Schuetts knew nothing whatever as to the value of the Lake street premises or the saloon business conducted there. They were not informed as to the amount of wines, liquors, cigars or other merchandise on hand at that time. They had no knowledge, except as informed by Richter, as to the value of such goods or as to the amount of business which had been or was being transacted at that time and relied wholly and exclusively upon the representations made to them by Richter. Richter knew that they were relying upon every representation made by him, and that they did not make any investigation as to any of such facts because of their reliance on him. He made the representations for the purpose of defrauding them. The fair and reasonable market value for the Lake street property and the improvements thereon on March 19, 1917, was not to exceed $3000. The Schuetts did not af-

firm or acquiesce in the fraud practiced on them at any time after the discovery thereof, and in August, 1918, after the discovery of the fraud, they offered to return the Lake street property to the Richters and to take back the Bellwood property, which offer was refused by the Richters.

The evidence in the record is very voluminous and we shall not attempt to discuss any further details of it.

As to the chattel mortgage and note, the substance of the claim of the Schuetts is that it should have only been for $500; that this latter sum was the amount to be paid for the fixtures, etc., and that there was nothing said to the effect that they were to pay $500 more for the unexpired license. While the evidence is very greatly confused on this question, the testimony of Schuett tends to show very clearly that he not only knew that this note was given for $1000, but that it represented $500 for the saloon fixtures, etc., and $500 for the license. He at first testified that nothing was to be paid for the license. Later he testified: "Mr. Richter said the value of the license was $500. Mr. Richter paid $500 to the woman for the fixtures for me. That makes the $1000 for the license and what the woman [Mrs. Fendt] had coming to her. I paid that by the month." Previous to this testimony he testified: "For the chattel mortgage I got a license. I paid $125 and the rest I got from Mr. Richter." He evidently got confused in his statements as to the license he bought on May 1 and for which he paid $500,—$125 cash and the rest he borrowed at the bank, Richter signing the note for him as surety,—but his testimony shows that he knew that the chattel mortgage was for $1000 and that he had the idea the license was part of the consideration for the chattel mortgage and note. Besides, Wolf, the notary public that drew up all the documents for the Richters and the Schuetts, testified that after they were drawn they were all read and interpreted, and that he explained the documents to them before they signed them, and that in doing so he spoke German to the Schuetts.

Mrs. Schuett testified that Richter told them they were to have the saloon fixtures for $500, but she did not know what he said about the license. They both knew that they signed a note and chattel mortgage for $1000 and a note and trust deed for $1000, if the testimony of the notary, who is apparently a disinterested witness, is to be believed. The Richters corroborate the notary public, and they were all that were present at the execution of the two notes and the two mortgages. The testimony in the record shows that the Schuetts were unable to read or write English, and it also shows that they had little experience in business matters and none in the saloon business and that the Richters were much more experienced in business matters of all kind, but it also shows that the Schuetts speak and understand English and that they testified in English. The record also clearly discloses that they both had intelligence enough to know that if their contract with the Richters was to the effect that the Richters were letting them have the Lake street property for $5000, less the $2000 incumbrance thereon, and were to allow them $3000 for the Bellwood property, there would be nothing remaining in the way of difference as a basis for the trust deed and mortgage of $1000.

We are unable to conclude, whatever else may be said about the finding of the court, that its last finding, to the effect that the Schuetts did not affirm or acquiesce in the fraud practiced on them at any time after the discovery thereof, is supported by the evidence in the record. The evidence of the Schuetts shows otherwise. Their testimony shows that they ran the saloon business from the time they took possession until about November, 1917,—over seven months. They renewed their license the first of May, 1917. Schuett positively testified that the stock of liquors on hand was exhausted within a very few days after he began with the business and that he knew within about four days that he had been defrauded by the Richters; that he knew within two days after he went into the business that he had been

cheated. Mrs. Schuett also testified that they knew right along that the property was not worth $5000 and knew all about the bad condition of the house that they testified to; that they saw that they were cheated but did not take any action or tell the Richters anything about it; that she never suggested to the Richters, and her husband did not, that the contract should be rescinded and the property reconveyed. In September, 1918, she asked Richter to trade back and told him that they could not pay any more money on the contract, but that she did not tell him that he had cheated them. The first claim that they ever made that they were defrauded and wanted the contract rescinded, so far as the record shows, was when they filed their original cross-bill and answer in this suit. Notwithstanding the knowledge they claimed to have had of this fraud, they made payments to the Richters of $50, and sometimes $55, per month on the chattel mortgage up to September 1, 1917, when they had paid $360 thereon, and they made later payments on their contract. They paid the taxes on the Lake street property for 1916 on August 2, 1917. They renewed the loan of $2000 on the property at the Greenebaum Bank and paid the interest on that loan in 1917 and in 1918.

The evidence on the question of a confidential relation existing between Richter and the Schuetts is not, to say the least, very strong, but conceding that the record sustains that contention of appellees, there is absolutely no evidence in the record that this relationship continued after the Schuetts took possession of the Lake street property and after they came into knowledge of the fact that the Richters had cheated or swindled them. It would be rather unreasonable for them to claim that such a relation did continue after knowledge of the fact that the Richters had swindled them. There is no evidence in the record as to the receipts or profits of the Schuetts in the saloon business after they began it. There is no evidence upon the subject, but they claim that they did not make any profits and that this was

the reason why they quit operating the saloon in November, 1917, and that they made their payments to the Richters and to the bank on their debts out of money Schuett earned while working on the railroad as a section hand while their son was running the saloon. The evidence does show that they quit paying the Richters after they closed the saloon, and that they closed it because they did not have money enough to get another license.

Our conclusion is that the decree of the circuit court is erroneous in granting the relief prayed for in the cross-bill and in dismissing the original bill for want of equity. It is a settled principle in equity that a person who has been defrauded will not be permitted, after he learns of the fraud, to stand inactive and fail and refuse to execute his option to rescind the fraudulent transaction until the events of the future may determine it to be to his interest, or otherwise, to rescind. (*Follett* v. *Brown,* 188 Ill. 244; *Stackpole* v. *Schmucker,* 225 id. 502.) The rule is stated in Pomeroy's Equity Jurisprudence (section 897) in this language: "The person who has been misled is required, as soon as he learns the truth, with all reasonable diligence to disaffirm the contract or abandon the transaction and give the other party an opportunity of rescinding it and of restoring both of them to their original position. He is not allowed to go on and derive all possible benefits from the transaction and then claim to be relieved from his own obligations by a rescission for a refusal to perform on his own part."

The cases of *Vigus* v. *O'Bannon,* 118 Ill. 334, *Gillett* v. *Wiley,* 126 id. 310, and *Farwell* v. *Great Western Telegraph Co.* 161 id. 522, cited by appellees, lay down the proposition that failure to use reasonable diligence to discover fraud in a transaction is excused where there is a relation of trust and confidence between the parties. In this case there was a delay of at least nine months after discovery of the fraud before an offer was made to trade back or

rescind the contract on the part of the Schuetts, and then they made no claim of fraud to the appellants. It is not plausible, we think, to contend that the Schuetts reposed confidence and trust in Richter after they discovered that he had defrauded them, and the evidence does not show that such confidential relation continued between them, if it ever existed.

The decree of the circuit court is reversed and the cause is remanded.

*Reversed and remanded.*