People of the State of Illinois ex rel. Oscar Nelson v. Union Bank of Chicago.
Appeal of Roy A. Miller et al., Appellants, v. Harry B. Spellbrink, Successor-Receiver of Union Bank of Chicago, Appellee.

Gen. No. 41,349.

92

Opinion filed January 22, 1941.

MAXIMILIAN J. ST. GEORGE, of Chicago, for appellants.

SCHUYLER & HENNESSY and KIRKLAND, FLEMING, GREEN, MARTIN & ELLIS, both of Chicago, for appellee; ROBERT N. GOLDING, of Chicago, of counsel.

MR. PRESIDING JUSTICE HEBEL delivered the opinion of the court.

On March 22, 1933, by leave of court first had and obtained, 28 petitioners filed their intervening petition in this cause, alleging that they have claims against the receiver of the Union Bank of Chicago for money had and received together with interest thereon at the rate of 5 per cent per annum from January 2, 1926, and that such claims are trust claims

and should be paid in full. These claims vary from $500 to $40,560. Later, Lottie Moran, one of the petitioners, was dismissed as a party to said intervening petition. The receiver filed an amended answer thereto. The matter was referred to a master who, in due course, made his report of the law and the evidence, which report the court approved after overruling all exceptions thereto and dismissed said intervening petition and ordered the receiver to pay the master's fees and charges of $1,515.90. From this order this appeal was taken by the petitioners.

From the facts as they are related in the petitioners' brief, it appears that on April 1, 1925, one, A. S. Alexander, entered into a contract with the Commercial Bank and Trust Company of Miami, as trustee, to purchase 8,884 acres at $375 an acre or a total of $3,317,726.25. The contract provided that when $1,327,090.50 of the purchase price had been paid the bank would execute a special warranty deed for the premises free and clear and take back a mortgage for the balance which mortgage was to contain a clause releasing any of the lands upon the payment of $500 per acre, "provided, however, that all lands lying in any one section should be released at the same time."

On August 1, 1925, Alexander assigned this contract to one, Robert Boyland, who was in the employ of a certain Mark Rafalsky of New York. On August 21, 1925, twenty days afterwards, Boyland, for a stated consideration of $100,000, gave four options to purchase out of this land four parcels, totaling about 2,355 acres, to Harry Phelps, Ralph Hartenstein and Fred Morphett, three employees of one, G. Frank Croissant, a real estate subdivider, with headquarters in Chicago, Illinois. On October 15 and 16, 1925, these options were assigned to Frank K. Reilly, one of Croissant's associates; and on October 20, 1925, Reilly entered into four contracts for deeds with Boyland. In these four contracts Boyland agreed to convey the

acreage described in the four options upon the payment of $2,993,250, of which $673,312.50 was acknowledged and the remainder of $2,319,937 was made payable in three equal installments on or before the 21st day of August in the years 1926, 1927 and 1928, and were evidenced by Reilly's notes. Four warranty deeds were executed by Boyland to Reilly and on October 22, 1925, were deposited with the Palm Beach Bank and Trust Company of West Palm Beach, Florida, with instructions to deliver them to Reilly or his assigns upon proper showing that the deferred installments "have been paid and that the transaction is otherwise complete." By these four contracts for deeds Reilly agreed to pay Boyland $2,500 per acre for 1,015 acres and $1,500 per acre for 1,345 acres. Boyland under his assignment agreed to pay $375 for this land.

On December 31, 1925, Reilly made four assignments of this acreage to G. Frank Croissant, trustee. These assignments were filed for record on June 25, 1926, and were recorded on June 29, 1926 in Palm Beach, Florida. This acreage was to be purchased for the purpose of subdividing it into lots to be sold by Croissant, as trustee, to the public at prices which would have netted enormous profits to the syndicate members. In October or November, 1925, this acreage was actually subdivided, contracts for deeds from Croissant as trustee printed, in which Croissant as trustee agreed to convey in fee simple the lots purchased by "a good and sufficient deed," "title to be shown by abstract of title or Title Guarantee Policy . . . showing title in grantor," and many lots were sold.

When these option contracts were made Croissant was in Europe, but before his return his organization began selling units in the syndicate which was to be formed for the development and sale of this Florida acreage described in the options and subsequent contracts. Moneys were collected from syndicate sub-

scribers and deposited in the Union Bank of Chicago and a receipt, referred to as an interim receipt, was given to the syndicate purchasers. This interim receipt was entitled "In re: Trust No. 949," and acknowledged the receipt in full payment of a pre-organization subscription to a syndicate to be known as G. Frank Croissant's Boca-Raton Development, to be organized for the purpose of purchasing acreage in Florida. This receipt—as stated in the briefs—is an "interim receipt and a permanent receipt will be substituted therefor when prepared and executed. It is understood that if the proposed syndicate is not completed and the land is not purchased by January 2d, 1926, the holder hereof is entitled to the return of the amount subscribed." This was signed by the Union Bank of Chicago as agent, by George T. Preschern or F. H. Hayes.

Croissant returned to Chicago by October 11, 1925, and an intensive selling campaign was launched under his direction. Advertisements about Boca-Raton acreage appeared in the various Chicago papers, which is quoted as follows:

"The banks handle your money—I don't." "One more big point—I will make a contract with this syndicate that my Florida organization of over 500 sales persons—nine Florida offices—will devote their entire time to this proposition until 75% of the total has been sold. And I will back them to the extent of $500,000.00 for sales promotion, including advertising, in five months or less." The attention of petitioners was directed to these advertisements and they were told by salesmen that all the funds would be deposited with the Union Bank of Chicago, that this bank would handle the money, that Croissant would have nothing to do with the handling of the funds and that if the proposed syndicate was not completed and if the land was not purchased by January 2, 1926, they would have returned to them the money paid by them

to the syndicate. In reliance on these representations petitioners purchased the units in the proposed syndicate in varying amounts from $500 to $40,560, and all received their interim receipts from the bank prior to January 2, 1926. Attorneys were employed to draw up a trust agreement dated December 15, 1925, by and between the various subscribers, called beneficiaries, and Croissant, in the dual capacity of trustee and manager. This trust agreement recites that, "the beneficiaries are about to cause to be conveyed to and vested in the trustee, as trustee under the trust agreement," the acreage in question, in Boca-Raton. Among other things this trust agreement provides: that the title to all of the subdivision lots be in the trustee who was to prepare, execute and record a plat of the subdivision lots, and furnish the price schedule at which said lots were to be sold; that the trustee have full power and authority to manage, improve, sell and convey the trust estate or any part thereof, and to partition the subdivision lots; a committee of five persons of whom Croissant was one and George Preschern another, was created to represent the beneficiaries; all notices were to be given to George T. Preschern at the Bank's address; the beneficiaries were to have an undivided interest, they having subscribed a total of $2,100,000, which was the capital of the syndicate, divided into 4,200 units of $500 each.

About the first week in January, 1926, petitioners received letters from Croissant, trustee, dated December 31, 1925, stating that the permanent certificates were ready at his office and requesting them to bring in and turn over the interim receipts issued by the bank and to sign the trust agreement. All of the petitioners, except Greenlee and Andrews, surrendered their interim receipts and received a certificate signed by Croissant, trustee, dated January 2, 1926, certifying that the petitioner was the owner of a certain number of units in said Croissantania Boca-Raton

syndicate and that the certificate was issued under the terms of the syndicate agreement dated December 15, 1925, and entitled the holder to the rights and benefits accorded a participant of said agreement but subject to and upon terms and conditions therein stated, that by the acceptance thereof, the holder agreed to be bound by all of the terms of said agreement. This trust agreement was signed by petitioners after the middle of January, 1926, and petitioners executing same were told by representatives of Croissant that the syndicate was completed, the land in Florida purchased, that the title was good in the syndicate, that the syndicate was in a position to sell lots and deliver good title thereto, and that it already had sold many lots, and believing these representations petitioners signed the trust agreement.

The moneys received from the various members of the syndicate for the purchase of units were deposited in account No. 949, and account No. 1073, in the Union Bank of Chicago. Contrary to the representations that the Bank was to handle the money and not Croissant, all funds from these accounts were paid out on the instructions of either Croissant or one of his managers. These withdrawals were approved by either George T. Preschern, trust officer, or Frank H. Hayes, assistant trust officer of the Union Bank of Chicago. The first payment from the trust funds, approved by the trust officer of the Bank, was made on October 17, 1925, for $500,000 to Frank K. Reilly. There was another payment made to Frank K. Reilly on October 19, 1925, also approved by the Bank officials in the sum of $60,000. These moneys were used in the purchase of the Florida land. Other payments were made on and after October 24, 1925, and a final disbursement was made on April 27, 1926. All the other disbursements from the two accounts were made to Croissant and to his various managers on account of commissions and, in a few instances, on account of refund of sub-

scriptions. The sum of $5,034.15, was paid for legal fees and expenses, and the sum of $5,000 was a refund to Croissant for attorney's fees advanced by him. Among these disbursements was also a payment to the Bank of $65, for its fees in handling account No. 949, and the sum of $97.50 for the Bank's fee in handling account No. 1073; so that at the signing of the trust agreement by petitioners it is claimed by petitioners there was little money of the syndicate in the Bank, and the little that was there was not transferred to Croissant, as trustee, but was transferred to Croissant personally. That is, of the total amount of $1,383,769.32 deposited in trust with the Bank to purchase land in Florida, only $560,000 was used on account of such purchase and the balance paid out for commissions and attorneys' fees.

It is also claimed by petitioners in their statement of facts that they were not advised until April, 1926, that there was any difficulty either about acquiring the land or raising the necessary funds to pay therefor. The first intimation that petitioners had of any irregularity came in April, 1926, at a meeting of the syndicate members, which was called by Croissant. This meeting was addressed by Croissant, who informed them that there was no selling of lots, that the Bank had failed to get title to the property, but that the Bank was still behind the proposition, and that every subscriber would have his money refunded without loss. It also appears from petitioners' statement of facts that thereafter Croissant and his organization by letter and personal solicitation endeavored to induce syndicate holders to transfer their certificates and interest in the syndicate for various other subdivision lots being sold by Croissant, and also to accept the repayment of their investments in installments over a period of time by placing the matter in escrow at the Bank. These efforts continued until some time after

November, 1929. By the middle of August, 1929, $981,000 of syndicate certificates were purchased and the money returned to the purchaser through the Bank. $326,400 of certificates were held in escrow at the Bank, of which sum $203,497 was paid to syndicate holders, or a total of $1,213,182.06 out of $1,383,769.32 was paid back, leaving $170,587.26 outstanding, a part of which, it is suggested, was no doubt satisfied by the transfer to them of lots in other subdivisions. It further appears that a total of $148,911.19 was returned to the purchasers of lots in Boca-Raton, and various other purchasers were satisfied by having transferred to them other properties where Croissant was able to furnish good title. Croissant had been called to Washington and had been ordered by the United States Attorney General to refund this money.

The Union Bank of Chicago during the month of April, 1926, and thereafter was trustee in 66 trusts in which Croissant was interested. Some of these trusts pertained to subdivisions in and around Chicago. As of October 17, 1927, the contract balances on these subdivisions in the hands of the Bank amounted to $4,591,657.44, and the deferred commission balance due to Croissant at that time amounted to $655,388.80. In addition to this Croissant had certain beneficial interests in the Bank, totaling $167,406. All of these assets were pledged as security by Croissant on a certain note, which Croissant executed in the sum of $100,000. This note was dated September 15, 1927, and, with said pledged assets, was delivered to the Bank and thereupon the Bank credited Croissant with the sum of $100,000, which enabled Croissant to pay back some of the moneys deposited by syndicate holders in the Bank.

The claims of petitioners were not satisfied in full by Croissant nor by the Bank. So petitioners filed their suits in the municipal court of Chicago and also

in the superior court of Cook county for the purpose of recovering from the Bank and in some instances from the Bank and Croissant, the moneys paid by petitioners. Later when the Bank went into receivership petitioners filed collectively their claim in that proceeding.

It also appears that each petitioner subscribed to a proposed Florida land syndicate, paid the amount of such subscription to the Bank and received from the Bank an interim receipt signed by the Bank, as agent, acknowledging the receipt of the money "in full payment of a preorganization subscription to a syndicate to be known as G. Frank Croissant's Boca-Raton Development, to be organized for the purpose of purchasing acreage in the State of Florida. . . . It is understood that if the proposed syndicate is not complete and the land is not purchased by January 2, 1926, the holder hereof is entitled to the return of the amount subscribed."

It is, therefore, suggested by the petitioners that, as neither the land was ever purchased nor the syndicate completed, they are entitled to the return of their money, together with interest at 5 per cent from January 2, 1926, to be paid out of the trust funds of the Bank, and that the receiver should give an account to petitioners for the funds it collected from deferred commissions in the 66 land trusts turned over by Croissant to the Bank for the purpose of raising funds to repay syndicate members.

The defendant calls to our attention that the case results from the failure of a Florida land syndicate, known as G. Frank Croissant's Boca-Raton Development, and that the matter first came before the Federal court in Chicago in September, 1927, when a member of the syndicate filed a bill on behalf of himself and all other members, including the plaintiffs, to wind up the trust and to fix liability. The opinion of the circuit

court of appeals (27 F.(2d) 48) summarizes what is described as "an unusually involved and confusing situation." Counsel for the petitioners, representing some 30 odd individuals who had subscribed money to the syndicate, did not intervene in the Federal court, but instituted suit against the Union Bank and Croissant in the municipal court of Chicago, basing his claim upon a violation of the Blue Sky Law. The case of *Orr v. Croissant* was brought to this court as a test on that point, and other cases were continued generally pending a decision. The court held that the Union Bank of Chicago was not liable for any violation of the Blue Sky Law (253 Ill. App. 396) and certiorari was denied by the Supreme Court. The statement of claim in one of the 30 cases was then amended to present the theory that the Union Bank of Chicago had undertaken and promised in writing to purchase certain lands and to complete the syndicate by January 2, 1926; that it had not done so, and that, therefore, the plaintiff was entitled to recover the amount subscribed. All the other cases were continued generally pending a decision of this theory.

In the case of *Moran v. Union Bank of Chicago,* which was the test case, this court held in 266 Ill. App. 315, that the Union Bank of Chicago was not liable. Because the decision was to control the disposition of other cases, this court certified questions involved to the Supreme Court. The Supreme Court, in 352 Ill. 503, also held against the contentions of the syndicate member. The Supreme Court of Illinois was under no misapprehension about what it was doing, because in the petition for rehearing, present counsel for the petitioners said: "This Court has already been informed that a great many other cases will be affected by the decision in this case. It is, therefore, most important that not only the ultimate decision of this Court but all the steps which result therein and reasons

therefor should be clear and without any doubt." The petition for rehearing was denied by the Supreme Court.

Thereafter, the Union Bank of Chicago went into receivership, and all of the cases which were supposed to be determined by the *Moran* case were brought up again as claims filed in the receivership case.

The plaintiffs' present contention is that the *Moran* case differs to such an extent from the record in this case, that the *Moran* case should not control the disposition of these claims. Neither the master nor the trial judge agreed with this point of view, and therefore this case is now here on appeal.

The petitioners' first question that is called to our attention is that the land, which was under consideration, was not "purchased" by January 2, 1926, and that under the interim receipts the petitioners were entitled to the amount subscribed by them. The chancellor found—it is contended by petitioners—that on the question of purchase of land and obtaining of good title, it appears most convincingly that the syndicate never had title and that although petitioners made a clearer and stronger case on this point than was made in the *Moran* case, it does not affect differently the construction of the word "purchased" as construed in the *Moran* case. Petitioners further suggest that to properly construe the terms "purchased" as used in the interim receipts, it is necessary to consider the facts as they appear in this case; and that the syndicate was being formed to purchase land in Florida to be subdivided and sold by a trustee in fee simple by good and sufficient deeds. The chancellor finds that there was no title in anyone and certainly there was no title in the trustee. He further finds that there was no attempt made to give the trustee a semblance of title, as no deeds by anyone, not even Boyland nor Reilly, were ever executed to the trustee. Petitioners admit as being true that deeds from Boyland to Reilly

were executed and placed in escrow, but state that Reilly never executed deeds from himself to Croissant, the trustee, Reilly merely assigning his contracts to Croissant.

As to the suggestion that was made that petitioners have made a stronger case than was made in the *Moran* case, it is well to have in mind what the Supreme Court said in that case, 352 Ill. 503, which is important to be considered on the questions that are involved in the present appeal. In that case the court said:

''The appellant, however, argues that at the time the syndicate agreement was signed, the land had not been purchased within the meaning of that term as used in the interim receipt. 'Purchase,' in its enlarged and legal signification, means every mode of acquisition of an estate known to the law, except that by which an heir, on the death of his ancestor, becomes substituted in the latter's place by operation of law. (*Champion v. Spurck,* 302 Ill. 241; *Chicago and Eastern Illinois Railroad Co. v. Doyle,* 256 id. 514.) A purchase may be made when a contract of purchase is signed. (*Dean v. Anderson,* 34 N. J. Eq. 496.) Contracts for the purchase of various parcels of land had been entered into and assigned to the trustee under the syndicate agreement when that instrument was signed by the appellant. The acquisition of the title by a conveyance in fee simple was not made a condition precedent to the completion of the syndicate. The evidence fails to disclose noncompliance with the provisions of the interim receipt.'' The language just quoted from the *Moran* case is important as to whether there was a noncompliance with the provisions of the interim receipt, and we quite agree with what was there said, and further, we believe that in the instant case the evidence fails to disclose noncompliance with the provisions of the interim receipt.

The second question that is called by petitioners to the attention of this court is that the syndicate fund

was a special deposit and that any withdrawals except as permitted in the interim receipt were unauthorized. They further contend that the interim receipt, signed by the Bank, promised petitioners, among other things, that they had paid their money for a preorganization subscription to a syndicate "to be organized for the purpose of purchasing acreage in Florida," and that if the proposed syndicate were not completed and the land not purchased by January 2, 1926, they were "entitled to the return of the amount subscribed"; and further suggest that the only reasonable interpretation of this provision is that the syndicate itself was to purchase the land; so that any payment whatever to anyone except to the syndicate itself or to the trustee appointed after the syndicate was completed, was at the Bank's peril. (*Mester v. Quincy Nat. Bank,* 163 Ill. App. 645, 647.) And urge that this is the more evident when one considers that the interim receipt, being of the Bank's own making and choosing, must be construed most strongly against it. Petitioners strenuously contend that the Bank had no right whatever to pay out one penny either for the purchase of the land, or to Reilly, or to Croissant, and that the only party to whom the Bank was authorized to pay any of the trust funds was the syndicate itself, after it had been fully completed. Then again, on this question, we are to consider what was said by the Supreme Court in the *Moran* case (*Moran v. Union Bank of Chicago,* 352 Ill. 509), where the following language was used:

"The final contention is that the withdrawals of funds from the syndicate's account with the appellee were made without the appellant's knowledge and that they were therefore fraudulent. The law charges a person with the knowledge he might have obtained by making use of the means afforded him. (*Johnson v. Miller,* 299 Ill. 276.) If the appellant failed to exercise her right to become informed of the syndicate's

status at the time she signed the agreement and remained silent after she ascertained or had the opportunity to ascertain the facts, she would not be permitted afterwards to complain. (*Richter v. Schuett,* 314 Ill. 127; *Stackpole v. Schmucker,* 225 id. 502; *Follett v. Brown,* 188 id. 244; *Naugle v. Yerkes,* 187 id. 358; *Sutter v. Rose,* 169 id. 66.) She approved the project after her trip of inspection in Florida. The trustee was vested with power to collect the money deposited with the appellee and to manage the estate. Manifestly, the evidence discloses no fraudulent action on the part of the appellee.'' That language, of course, applies to the facts as they appear in this record. It is apparent that the petitioners had a right, as did the petitioner in the *Moran* case, to exercise their respective rights to become informed of the syndicate's status at the time they signed the agreement, and not having exercised those rights, but having remained silent after they ascertained or had the opportunity to ascertain the facts, they would not afterwards be permitted to complain.

It is also well to consider what the Supreme Court said in the *Moran* case, in passing upon the question of the rights of the parties after signing the syndicate agreement and accepting the participation certificate:

''The primary question presented is whether the appellant, by signing the syndicate agreement and accepting the participating certificate, and thereby becoming a member of the syndicate, is precluded from retracing her steps and demanding that the sum of money for which the interim receipt was issued be refunded to her by the appellee. The affirmative of that proposition is maintained by the appellee while the appellant asserts the opposite and insists that her execution of the syndicate agreement and acceptance of the beneficial certificate do not operate to prevent recovery by her in the present action.'' The petitioners suggest that notwithstanding the execution of

the syndicate agreement and acceptance of the participating certificates they are permitted to recover in this action. However, we are not in accord with this suggestion. As the Supreme Court said, the petitioners having signed the syndicate agreement and accepted the participating certificates, thereby becoming members of the syndicate, they are precluded from retracing their steps and demanding that the sum of money for which the interim receipt was issued be refunded to them.

The third contention that is made by petitioners is that they are not barred from maintaining their action on the interim receipt. As we have already indicated in this opinion, following the conclusion of the Supreme Court in the *Moran* case (*supra*), the acceptance of the participating certificates, after signing the syndicate agreement and becoming members of the syndicate, precluded the petitioners from retracing their steps and demanding the return of the money for which the interim receipts were issued. We are unable to further consider that question, other than what we have already said. The only suggestion that is offered by petitioners is that it is most clear from this record that at the time petitioners accepted the trust certificate and signed the trust agreement they did not have "full knowledge of what occurred," that they had no knowledge thereof at all and had not then "learned of the fraud" practiced upon them, that they had no inkling of the Bank's breach of trust. That, of course, is not of particular aid upon the questions involved here. At the time the syndicate agreement was signed and the participating certificates accepted, the petitioners had full opportunity to investigate and learn the facts as they were, and having acted as they did and having taken no steps for some time afterward, they will not be permitted afterwards to complain, when at the time no complaint was ever made except as stated in the record. As we have indicated, when the syndicate

members signed the trust agreement and accepted the participating certificates, they gave up any rights which they might have had under the interim receipt, as settled by the case of *Moran v. Union Bank of Chicago*, 266 Ill. App. 315, as well as the Supreme Court in *Moran v. Union Bank of Chicago*, 352 Ill. 503.

There is some question called to our attention that the date of the signing of the agreement in the *Moran* case is not clear, and, therefore, it may have been prior to January 2, 1926, the date mentioned in the interim receipt. The suggestion of the appellee is that this argument is to persuade this court that Mrs. Moran had signed before the date of performance, in which event there would have been no default to be waived. It appears clearly that Mrs. Moran signed pursuant to a letter dated December 31, 1925. There was not time for this letter to be delivered by mail to Mrs. Moran and for her to get down to the office and sign by January 2. Counsel for petitioners stated in his brief in this court in the *Moran* case, that after Mrs. Moran received this letter, she signed, "probably the end of the first week of January, 1926."

There is a suggestion by petitioners that the escrow agreements admit liability on the part of the Bank. The agreements provided that the Bank acted solely as escrow agent, the syndicate member having accepted Croissant's offer to repurchase the member's interest in the syndicate. It seems obvious that all members signing admitted, by doing so, that they had no claim against the Bank, but only against Croissant, and this suggestion, we believe to be an answer to petitioners' contention.

There is also a statement made by petitioners that the *Moran* case does not contain the facts that in April, 1926, there was no selling of lots in Boca-Raton, the appellee replying that this must be an inadvertent statement, because Mrs. Moran testified that Croissant stated at a meeting in April, 1926, "that there wasn't

any selling; that there was no need of pretending that there was.''

To the contention of petitioners that the Bank failed to get title, the appellee states that it was not shown in the *Moran* case, nor in the instant case, that the Bank failed to get title, and it is urged that, in the *Moran* case, title was by contract with a down payment, delivery to be made when the balance was paid. The same thing is true in the case at bar. Croissant made it perfectly clear that the only thing wrong was that the money ran out; that the syndicate started out with a capital of $2,100,000, with which it was to engage in an enterprise requiring $7,865,000, and the members must have had in mind the chances they were taking. As this court said in the *Moran* case (266 Ill. App. at 323), ''it is unfortunate that all syndicates are not successful.''

The petitioners suggest that the Bank was back of the proposition and that there would be no loss, and the appellee in reply states that the same contention was made in the *Moran* case, and that, in both that case and the instant case, the statement was made by Croissant, not by an agent of the Bank, and that, of course, the Bank cannot be bound by any such remark.

There are other questions that were raised, but, in view of the conclusion that we have reached as stated in this opinion, it will be unnecessary to take up each one. There is, however, one other contention of the petitioners that they are entitled to an accounting from the receiver of the Bank as to the collateral which Croissant deposited with the Bank to secure his loan, made to help repay syndicate members. As security for this loan Croissant turned over to the Bank certain beneficial interests totaling $167,406 and deferred commissions in 66 land trusts totaling $655,388.80. Petitioners contend that they are entitled to have the benefit of any amount collected by the Bank over and

above $100,000, advanced to Croissant, and further suggest that it might well be that the Bank collected out of these deferred commissions and beneficial interests more than enough to pay the $79,750 of claims of petitioners, and further that Croissant has not received any moneys from any of these trusts. The appellee answers this contention by stating that from the facts in this record, it is apparent that the Bank must account to Croissant for the collateral which he deposited to secure his loan, and suggest that the court consider by what rule of law do the petitioners acquire the right to have the Bank account to them for the property of Croissant, they holding no judgment against Croissant, nor holding any assignment of interest, and this not being a garnishment proceeding. The point is not of much practical importance because Croissant testified that "a lot of these deferred commissions at the Union Bank just evaporated," and so the appellee receiver contends that the petitioners are not entitled to an accounting, under the facts as they appear in this record, and we quite agree with this contention. It does not appear that petitioners have any judgment against Croissant, nor do they have an assignment of interest. Their claim in the instant case is against the Bank and not against Croissant. We are, therefore, of the opinion that there is nothing in this claim that would justify the court in reversing the trial court for error in this particular.

Having considered all of the facts, as well as the law and authorities that had any bearing on the questions involved, we are of the opinion that the court did not err in dismissing the intervening petition that was filed by the petitioners, and, therefore, it will be affirmed.

*Affirmed.*

Denis E. Sullivan and Burke, JJ., concur.