Harry Manaster and Brother, Appellee, v. Nancy Baker Young, Executrix of Estate of Frederick G. Baker, Deceased, Appellant.

Gen. No. 40,675.

546

Opinion filed December 13, 1939.

GALLAGHER, RINAKER, WILKINSON & HALL and GOLAN & GOLAN, all of Chicago, for appellant.

HENRY J. & CHARLES AARON, of Chicago, for appellee; FRANKLIN RABER and SIDNEY J. HESS, JR., both of Chicago, of counsel.

MR. JUSTICE BURKE delivered the opinion of the court.

On or about July 9, 1927, the United Packers, Inc., was chartered as a corporation by the State of Illinois. It had a capital of $100,000, represented by 1,000 shares, each of the par value of $100. John M. Clair held 375 shares, plaintiff corporation 375 shares, and Frederick G. Baker 250 shares. On or about September 1, 1928, Clair sold his stock to the other two stockholders and thereby plaintiff corporation became the owner of 650 shares and Baker 350 shares. At the time of the purchase of the Clair stock on September 1, 1928, plaintiff corporation and Baker entered into a written contract concerning the terms and conditions under which the stock of each might thereafter be sold. By its terms, the contract was binding upon the heirs, executors and administrators of Baker. The pertinent part of the contract, insofar as the instant law suit is concerned, is paragraph 3, which reads as follows:

"In the event of the death of said Baker, the said Manaster agrees to purchase from the estate or personal representatives of said Baker within ninety (90) days from the date of his death, the shares of stock in the Company owned by him at the date of his death at the book value of said shares on the last day of the month prior to his death, and the estate and/or personal representatives of said Baker shall be obligated to sell such stock to said Manaster." Baker was ex-

perienced in the meat canning business. He was made president of the corporation and placed in charge of the operation and management of its affairs because of his experience, knowledge and familiarity with that kind of business. Plaintiff corporation was engaged in the meat packing business and was not familiar with the meat canning business. Practically all of the stock of plaintiff corporation was owned by Harry Manaster and Henry Manaster, who are brothers. They controlled plaintiff corporation. The Manaster brothers invested a substantial sum of money in the canning enterprise because of the confidence which they had in Baker. If anything happened to Baker, plaintiff wanted to be in a position to dominate and control the corporation without outside interference. Baker, on the other hand, was a minority stockholder and desired to protect his estate in the event of his death. As president, Baker received a salary of $15,000 per year for some period of time. The company did not meet with the degree of success expected by its founders. It became necessary to retrench and cut down expenses in various ways. Baker's salary was reduced. The Chicago office of the new corporation was moved into the office of plaintiff corporation. It occupied plaintiff's office, rent free, and used the office equipment of plaintiff without charge. In the latter part of 1931 or the early part of 1932, the canning plant was moved from Green Bay to Chicago, and was located in premises purchased and equipped by plaintiff solely for the use of the new corporation. The business of the company continued to be operated at a loss. Baker died on June 8, 1933. He was then president of the company and a resident of Chicago. At the time of Baker's death, the new corporation was insolvent to the extent of $34,000. Its liabilities exceeded its assets, including paid in capital and paid in surplus by the sum of $34,000. At the time of his death, the shares of stock had neither market value nor book value. Plain-

tiff then, through its officers Harry Manaster and Henry Manaster, took sole charge of the corporation and proceeded to operate and conduct its business without suggestion or without interference from any outside source. The business was conducted on the credit and money furnished by plaintiff. Whatever increase there was to the net worth of the corporation between the time of Baker's death and the time of the institution of the instant proceedings, was due solely to the efforts, skill, knowledge and ingenuity of the Manaster brothers and to the credit, reputation and financial assistance extended by plaintiff corporation. Baker, in his lifetime, invested $35,000 in the corporation, by way of stock subscriptions and the purchase of shares, and contributed $6,300 to the surplus capital. During the same period of time, plaintiff corporation invested $65,000 by way of stock subscriptions and the purchase of shares of stock, and $11,300 by way of contribution to surplus capital. During the lifetime of Baker, he withdrew from the United Packers, Inc., in the form of salary $70,000. During that period of time neither of the Manaster brothers, nor plaintiff corporation, drew any money by way of compensation for services rendered. Baker left him surviving as his sole heir and next of kin his widow, Nancy Baker. Subsequently, the widow married Harry D. Young. Baker left a will in which he named his wife as the executrix of his estate and his sole legatee. She did not, however, file an application for letters testamentary until June 1, 1937. The letters testamentary naming her as executrix under the last will and testament of her deceased husband, were issued to her on July 7, 1937. An inventory of the estate was filed on October 27, 1937, and it listed the 350 shares of stock as an asset. Prior to and at the time of Baker's death in June, 1933, the Manaster brothers knew Mrs. Baker and had visited in her home and she in theirs, and they knew she was Baker's only heir at law. Following Baker's death,

Harry Manaster wrote Mrs. Baker on July 11, 1933, extending to her his sympathy and condolence in the loss she had suffered. The parties have stipulated that no attempt was made by plaintiff to purchase Baker's stock in accordance with the contract of September 1, 1928, until July 8, 1937, when plaintiff addressed a letter to Mrs. Young, as executrix, calling attention to the contract and offering to purchase the stock for the sum of $500. She did not comply with the request contained in the letter, and on July 21, 1937, plaintiff filed its complaint for specific performance, praying that the court determine the book value of the capital stock of the corporation as of May 31, 1933, and that the executrix be directed to deliver to plaintiff the 350 shares of capital stock owned by Baker at the time of his death, upon the payment by plaintiff to her of an amount equal to the book value of the stock as of May 31, 1933; and that in the event that the book value ascertained by the court should be less than $500, that she be required to assign and deliver the 350 shares of stock upon the payment by plaintiff to her of the sum of $500. Defendant answered and the cause was heard by the chancellor, who entered a decree in accordance with the prayer of the complaint, from which decree this appeal is prosecuted.

During the year 1934, the new corporation, through the influence and participation of plaintiff, succeeded in securing contracts for the canning of meat for the federal surplus relief commission. The meat which was canned was from the carcasses of animals purchased by the commission under a national emergency resulting from the great drought of 1934. From the contracts with the commission, a very substantial profit was derived, which is reflected in the profit and loss statement for the year 1934. However, subsequent to 1934 the new corporation was compelled to rely solely upon the sale of its own products. The earnings and profits for the years 1935, 1936 and 1937 show a sub-

stantial decline from the profits of the year 1934. The net worth of the company at the close of 1936, as contended by plaintiff, was $40,000, and the net worth of the company as shown by the balance sheet as of June 30, 1937, was approximately $17,000. Defendant disputes the latter figures and argues that certain charges made by plaintiff against the new corporation are improper. The stock was not listed on any exchange, nor was it sold or dealt in on any public market or otherwise. The corporation never paid a dividend and never operated on a profit outside of the year 1934, when it was canning meat for the federal surplus relief commission. Following the letter of condolence written by Harry Manaster to the widow on July 11, 1933, the evidence shows that the parties had no contact until February, 1934, when Mrs. Young attended the annual meeting of the stockholders. She also attended the annual meeting of the stockholders in February, 1935. She testified that she attended this meeting pursant to notices addressed to her. She did not produce the notices because, she said, they were lost by her attorney. No testimony was introduced contradicting the evidence that the notices were addressed to her. The only notice which she introduced was a notice of the annual meeting to be held in February, 1937, which was addressed to Frederick G. Baker. She stated that at the meeting in February, 1934, she told Harry Manaster that Baker had left a will naming her as sole legatee. There is no denial of that testimony. She also testified that in that conversation Harry Manaster asked her how much insurance Baker had left and that the company needed additional capital, and that she told him Baker had but little insurance. Harry Manaster did not deny that a conversation took place in February, 1934, but did deny that they discussed Baker's insurance, or that he told her the company needed money. Mrs. Young stated that at the meeting in February, 1934, she was asked if she

wanted to vote, and that she said, "No." She also testified that at that meeting Harry Manaster gave her an operating statement of the corporation for the years 1933 and 1934, and that she wrote him a letter on February 21, 1935. The letter was received in evidence. It requested specific information regarding the operating expenses etc. for the years 1933 and 1934. She received in reply a letter dated March 4, 1935, signed by Henry Manaster, informing her that all transactions between the new corporation and plaintiff were handled by Harry Manaster, who at that time was in Arizona and that the matters mentioned in her letter would have to be held in abeyance until he returned to the city. She testified that shortly after receiving this letter, she called him on the telephone and told him that she was not satisfied with the figures and that something was wrong. The record does not show that the parties had any contact in 1936. In the month of February, 1937, she executed proxies in her name to her then husband, Harry D. Young, and to another man named Wesley G. Brocker, for the 1937 annual meeting of the stockholders. Young and Brocker attended the meeting. They testified that at the meeting the attorney for the corporation examined the proxies and stated they were not in good order and that they would not be allowed to vote; that on inquiring of the attorney whether they would be allowed to ask specific questions concerning the earnings and financial condition of the corporation, he said, "No"; that he also said, "You are strangers to us. We do not know you. We do not care for you to do this." They quoted the attorney as saying that he was glad to know that Mrs. Young still had her stock, and that he did not know that; that he had heard once that she had disposed of it. He said that Mrs. Young should have put the stock in proper order; that they would wish to sit down with her and discuss the affairs of the company; that they had brought it back in good

fashion, but that the company would need money and they would want to sit down with her and talk over what she wanted to do about it. On February 17, 1937, which was the same day as the stockholders meeting, the attorney for the corporation wrote a letter to Mrs. Young, reading as follows:

"At the annual meeting of the stockholders of United Packers, Inc., today, Mr. Harry D. Young and Mr. Wesley G. Brocker presented proxies signed by you. Inasmuch as you are not a stockholder of record and as Messrs. Young and Brocker were strangers to the officers of the Company, I was obliged to advise that the proxies could not be legally voted.

"However, it is our desire to extend you every courtesy and I shall be glad to discuss the situation with you at any time. If you will telephone me at Central 8552, I will make an appointment with you for a convenient time." Mrs. Young and her husband called at the attorney's office and exhibited to him the stock certificate issued to her husband Baker. The certificate was indorsed by him and had been delivered to her prior to his death. The attorney was asked by Mrs. Young to transfer the stock to her name, and he advised her that such transfer could not be made until the will had been probated and inheritance taxes released. He did not make any demand at that time for a transfer to plaintiff, nor did he assert any claim as to the right of plaintiff to purchase. She quoted the attorney as saying that he did not know Mr. Young and Mr. Brocker when they appeared at the meeting, but that had she, Mrs. Young, attended the meeting, she would have been accepted and that he, the attorney, could probably get her an offer for the stock. She stated she replied that she doubted that any offer they could secure would be acceptable to her.

In urging that the decree be sustained, plaintiff states that time is not of the essence of the contract, and that, therefore, in decreeing specific performance

after the time fixed for performance, the court is not making a new contract for the parties. The intention of the parties as expressed by the agreement, controls on this question. In equity, time is not necessarily deemed of the essence of the contract, but if it is made so by the terms of an agreement, it will be treated in equity as in law, as of the essence; but even where the contract so provides, equity under peculiar circumstances may not enforce a forfeiture. Time may be made the essence of the contract by express stipulation to that effect, or it may be clearly shown by the wording. The precise phraseology is not important. (*Zempel v. Hughes,* 235 Ill. 424.) Where the contract is entirely silent as to the time, performance is required within a reasonable time. Defendant, on the other hand, insists that specific performance is not a matter of right, and that when one has abandoned a contract, equitable relief will not be decreed. If the conduct of plaintiff has been such as to show an intention to abandon the contract, then it cannot insist on specific performance of the contract. Plaintiff cites authorities that hold that where a contract is just and equitable, specific performance is a matter of right and not a favor. Defendant here does not contend that the contract is not fair and equitable. Plaintiff also argues that where an abandonment is relied upon, it must be shown to have been the clear intention of the parties, and that the burden of proof in establishing such abandonment, if any, is upon the defendant. Such abandonment, if any, must be established by clear and convincing evidence. On these propositions of law, there is no serious dispute. The difficulty arises in applying the law to the facts of the case. Plaintiff maintains that until the executrix was appointed, there was no duly constituted or authorized person to whom tender could be made or performance demanded, or against whom a proceeding for specific performance could be instituted. Plaintiff states that where the

personal estate of the deceased descends to the heirs or distributees, title thereto can be acquired only through the executor or administrator. Plaintiff also insists that failure to perform within the time required under the contract, was not due to the fault of plaintiff. We cannot agree with the position taken by plaintiff. Both parties knew of the existence of the contract. The officers of plaintiff knew of the death of Baker, knew that he had left a will and that his wife was the sole legatee and heir. She attended the meetings. At these meetings she was given information as to the condition of the corporation. A careful examination of the record convinces us that the corporation recognized her as a stockholder. The corporation, knowing of its obligation to purchase the stock, did not make any demand that she deliver the stock, or that she take steps to have herself appointed executrix, until four years had elapsed. In the meantime, she did not do anything to mislead the officers of the corporation. If the corporation was interested in enforcing its right to the stock, it could have made a demand within a reasonable time after the death of Baker. Under the statutes of this State, the matter of having a will established and letters testamentary issued thereon, would involve no difficulties. The law requires any person having in his possession a last will or testament shall immediately upon the death of the testator, deliver up the will to the appropriate court of probate, and upon failure so to do the court may issue attachment and compel the production of the will. In case no one files a petition to have the will admitted to probate, it is the duty of the court to proceed to probate the will without a petition being filed. When the person named as the executrix in the will refuses to act, or is otherwise disqualified, the statute requires that the court commit the administration of the estate to persons in the same order as if the deceased had died intestate. It is, therefore, plain that the matter of

securing the issuance of letters testamentary did not involve any difficulties. The conduct of plaintiff during a period of four years is entirely inconsistent with any intention on its part to seek performance of the contract. In fact, such conduct shows affirmatively that the plaintiff had abandoned the contract. Mrs. Young exhibited the stock certificate showing the transfer to her, to the attorney for plaintiff. If plaintiff had insisted at that time that it was the equitable owner of the stock, it could have suggested to Mrs. Young that she in turn indorse the stock certificate to the corporation. There does not seem to be any dispute that the assignment of the stock was a valid assignment. If the officers were not recognizing Mrs. Young as a stockholder, it is difficult to understand why they were giving her information and treating her as a stockholder. Their insistence, after four years, that she be appointed executrix, appears to be an afterthought. If plaintiff desired the stock, it would have been a simple matter for it to have made a demand within a reasonable time. The officers of plaintiff were experienced business men. Ordinary business judgment would dictate to them that the matter of their rights to the 350 shares of stock should be settled within a reasonable time after the death of Baker. We do not believe that a court of equity, under the factual situation disclosed, should exercise its extraordinary power of granting specific performance in a case where the parties themselves have not exhibited any desire for performance in a period of four years. We are asked now to decree the defendant to deliver the stock to plaintiff which its officers themselves did not seek during the period of almost four years. Admittedly, the 350 shares of stock now have a book value of at least $4,900. Granting specific performance, on the record in this case, is not warranted and would be harsh and contrary to equitable principles. The proof clearly established that by its conduct and delay, plain-

tiff abandoned its right to insist on delivery of the 350 shares.

For the reasons stated, the decree of the circuit court of Cook county should be and it is reversed and the cause remanded with directions to dismiss the complaint for want of equity at plaintiff's costs.

*Reversed and remanded with directions.*

DENIS E. SULLIVAN, P. J. and HEBEL, J., concur.