## Mildred C. Johnson, Appellee, v. Whitney Metal Tool Company, Appellant.

### Gen. No. 10,422.

Opinion filed October 7, 1950. Rehearing denied February 8, 1951. Released for publication February 12, 1951.

HYER, GILL & BROWN, of Rockford, and BELL, BOYD, MARSHALL & LLOYD, of Chicago, for appellant.

MAYNARD & MAYNARD, of Rockford, for appellee.

MR. JUSTICE DOVE delivered the opinion of the court.

At a meeting of the board of directors of the Whitney Metal Tool Company, an Illinois corporation of Rockford, Illinois, held on February 26, 1942, a resolution was adopted giving appellee, Mildred C. Johnson, nee Mildred C. Haegg, an option to purchase a substantial amount of the unissued stock of the company at a par value of $10 per share. This resolution recited that the option was being granted ''as a reward for her many years of faithful devotion and loyalty to the interests of this company'' and directed John Jensen, the then president of the company, to report back to the board of directors Miss Haegg's decision as to the amount of stock she desired. On April 30, 1942, the board of directors of the company met, and the record of that meeting recites: ''Mr. Jensen reported he had interviewed M. C. Haegg on the option extended to her in regard to the purchasing of stock and reports she has decided to take 250 shares at a par value of $10.00 per share; the stock to be issued to her in block of fifty shares each upon the payment to the company of $500.00 for each block. Mr. S. E. Hyer made a motion the above privilege be granted and it was passed unanimously by the board.''

On December 17, 1948, the plaintiff, Mildred C. Johnson, filed in the circuit court of Winnebago county her verified complaint which set forth the foregoing resolution of the company of February 26, 1942, and alleged that shortly thereafter the president of the company, John Jensen, inquired of the plaintiff her intention with regard to the purchase of the stock men-

259

tioned in the resolution and the amount thereof she would purchase and that plaintiff advised Jensen that she was ready and willing to purchase 250 shares of the common capital stock of the company but would have to have time within which to pay for it. The complaint also set forth the resolution of April 30, 1942 and alleged that after purchasing said stock she continued in the employ of the company until February 27, 1947; that at no time between February 26, 1942, and February 27, 1947, did the defendant company or any of its officers demand of the plaintiff the payment of $2,500 for the 250 shares of the capital stock of the company or in any manner inform the plaintiff of any retraction or cancellation of said sale; that in January 1947, she offered to pay for said 250 shares of stock and in February 1947, tendered to the company a cashier's check for $2,500 and alleged the refusal of the company to accept the same. The complaint then avers that the plaintiff "has been at all times ready, able and willing to pay to said company $2500.00 for said 250 shares of the common capital stock of the defendant company," and prayed for an order directing the defendant to issue to the plaintiff 250 shares of the common capital stock of the company for the sum of $2,500 and decree to the plaintiff all dividends upon said stock from and after February 26, 1942, upon the payment by the plaintiff to the defendant of five per cent interest on said sum of $2,500 from and after February 26, 1942. The answer of the defendant admitted the passage of the resolutions of February 26, 1942, and April 30, 1942, denied that the plaintiff ever purchased 250 shares of the capital stock of the company from the company and averred that all the plaintiff ever had was an option to buy 250 shares of the capital stock of the company for $2,500; that while well able to do so plaintiff at no time, until the month of February 1947, was ready or willing to purchase

said stock or exercise said option and that she unreasonably delayed in that respect; that in the meantime the stock, as well known to the plaintiff, had greatly increased in book value and earning power. The answer admitted that in January 1947, plaintiff offered to take and pay for said stock and admitted that the company received the cashier's check for $2,500 in February 1947, and that the company refused to accept it. The answer denied that the company ever issued the stock in question and denied that any dividends had ever been paid upon said stock and denied that plaintiff was entitled to any relief.

The issues made by these pleadings were submitted to the chancellor resulting in a decree directing the company to issue and deliver 250 shares of the common capital stock of the defendant company to the plaintiff upon plaintiff paying to the company $2,500. To reverse this decree, the Whitney Metal Tool Company prosecutes this appeal.

From the pleadings and evidence, it appears that the plaintiff went to work for the defendant in 1914 as a general office girl and continued in its employ until February 27, 1947. At the time she entered the employment of the company, it was a small company and employed two to four men. The number of stockholders was quite limited. In 1936, the plaintiff became secretary of the company and continued as such until she left the company. In February 1944, she was elected a director and served until the annual meeting in February 1947. She was an efficient, capable employee and thoroughly familiar with the nature, volume and amount of business the company did and testified that it came as a surprise to her when she was advised, shortly after the directors meeting held in February 1942, that she had been given the privilege of buying some stock in the company. She was also advised of the resolution of April 30, 1942, and according to her

testimony as abstracted, this is what then occurred: "After the meeting of April 30, 1942, I again talked to Mr. John Jensen and with Charlie Joyce about the purchase of the stock. I talked to Mr. Jensen when Charlie Joyce was present about giving a note for the stock. They both had mentioned it before to me about the purchase of the stock and I told them that I was unable, at the time, to pay for it and that I would have to have some time, perhaps a couple of years, because we had purchased our home and I had some obligations and didn't want to take on the purchase of this stock at that time unless I could get them to take my note or perhaps borrow the money at the bank and put up the stock for collateral and Mr. Joyce objected to my borrowing money at the bank and said they would be unable to accept my note."

Charles B. Joyce testified on behalf of the plaintiff that he was a public accountant and began working for the defendant in 1919 or 1920 and in 1942 was a member of the board of directors of the company; that he attended the meetings of the board on February 26, 1942, and April 30, 1942; that at the February meeting John Jensen suggested an allocation of stock to the plaintiff and he, Jensen, was instructed to contact the plaintiff and find out how much stock she wanted and to report back at a subsequent meeting; that Jensen told the board at the April meeting that plaintiff decided to accept the option given her to purchase 250 shares of stock; that about the time of the April meeting he had a conversation or discussion with Mr. Jensen in the presence of the plaintiff; that in this discussion the fact that plaintiff was either building a new home or paying for a new home was mentioned, and Mr. Jensen set forth her inability at that time to exercise the option from a cash standpoint; that Jensen suggested to Joyce that the company take her note for the stock. "I pointed out to him," continued this

witness, "that a note taken for a stock issue was illegal at that particular time. He said he wanted to make it as lenient as possible for her to make these payments and that is why he suggested the note. She offered to give him a note at that time. The matter was never taken up with me from that date on."

The record further discloses that in 1942, the salary of the plaintiff was slightly over $4,000 per year; that each year thereafter her salary was increased: that in 1944, she received from the company $4,944.91; in 1945, $5,044; in 1946, $5,412; and at the time she left the company in 1947, she was receiving a salary of $500 per month. Appellee testified that she knew the sales and earnings of the company were gradually increasing from 1942 to 1947; that the book value of the stock was several times more in February 1947, than it was in February 1942, and knew that the earnings of the company, after taxes for the year 1946, were three or four times what they were in 1945.

The record further discloses that the book value of the stock of the company in 1942 was $48 per share; that the book value increased each year thereafter, and in 1947 it was $120 per share. In 1942, the net sales of the company were $786,374, the profit of the company after taxes was $34,070.07, and the earned surplus was $237,746.01. In 1946 the net sales were $1,098,117.31, the profit of the company after taxes was $175,875.66, and the earned surplus was $513,824.32.

The chancellor held that appellant offered, by its resolution of February 26, 1942, to sell a substantial amount of its unissued stock to appellee for $10 per share; that, she then, as reflected by the minutes of April 30, 1942, made a counter-offer to buy from the company 250 shares at $10 per share; that this counter-offer was accepted by the company, as reflected by the minutes, and thereby the company became obligated, upon the payment of $2,500, to deliver to her 250

shares of stock. The chancellor further found that under the facts and circumstances in evidence the delay of the plaintiff in offering to pay for this stock from April 30, 1942, to February 27, 1947, did not forfeit her right to enforce her contract by specific performance.

What the record shows in this case is that the board of directors of appellant, on February 26, 1942, gave appellee an option to purchase an undetermined number of shares of its stock at $10 per share. Appellee was informed of this offer and decided to take 250 shares at $10 per share, the stock to be issued to her in block of 50 shares each upon the payment to the company of $500 for each block. The minutes of the meeting of April 30, 1942, recite these facts and then show that by the unanimous action of the board of directors appellee was given this privilege. When informed of this action, there were two courses open to her. She could accept the offer as made or she could reject it. She testified that she told the president of the company and, also, one of its directors that she didn't want to take on the purchase of that stock at that time and that she was unable to pay for it. This was an unequivocal rejection of the offer, the effect of which was to leave "the matter as if no offer had ever been made." (6 R. C. L. 603, 604.)

It was after this that she made the company two counter-offers or counter-proposals. One was that she would give the company a note for the purchase price of the stock. This was declined. The other proposal was that the company issue and deliver to her the stock and she would negotiate a loan at a bank and use the stock as collateral security, and this proposal was also declined by the company.

No contract is complete without the mutual assent of the parties. A contract is made by an offer and an acceptance, and an offer imposes no obligation until

it is accepted according to its terms. So long as the offer has been neither accepted nor rejected, the negotiation remains open and imposes no obligation upon either party. The one may decline to accept or the other may withdraw his offer and either rejection or withdrawal leaves the matter as if no offer had ever been made. (6 R.C.L. 603, 604.) An assent to an offer is an act of the mind. If the party making an offer does not require an immediate response, and the offer itself seems to contemplate acceptance, assent of the other party will be implied, in the absence of a revocation, from his acting pursuant to it within a reasonable time. (6 R.C.L. 605, 606.) The assent to the offer must be substantially as made. There must be no variance between the acceptance and the offer. (*Maclay v. Harvey*, 90 Ill. 525.) An acceptance upon terms varying from those offered, is a rejection of the offer and puts an end to the negotiation unless the party who made the original offer renews it or assents to the modification suggested. The other party, having once rejected the offer, cannot afterwards revive it by tendering an acceptance of it. The acceptance must be unequivocal and unconditional. If to the acceptance of a proposal a condition be affixed by a party to whom the offer is made, or any modification or change in the offer be made or requested, there is a rejection of the offer. Having in effect rejected the offer by his conditional acceptance, the offeree cannot subsequently bind the offeror by an unconditional acceptance. (6 R.C.L. 608, 609.) Every person has the right to dictate the terms upon which he will contract and the proposer may limit the time for acceptance. Unless the time is limited, the proposition is open until it is accepted or rejected, provided an answer is given within a reasonable time. An acceptance after the time limited in the offer or in the absence of an express limitation, after the lapse of a reasonable time, will not bind the party making the

265

offer and imposes no obligation upon him. The offer, unless sooner withdrawn, stands during the time limited, or if there is no express limitation, during a reasonable time. Until the end of that time the offer is regarded as being constantly repeated. After that there is no offer, and properly considered nothing to withdraw. The time having expired, there is nothing which the acceptor can do to revive the offer, or produce an extension of time. (6 R.C.L. 609, 610.)

In *Northern Illinois Coal Corp. v. Cryder,* 361 Ill. 274–283, it is said: ''An option, so long as it remains unaccepted, is a unilateral writing, lacking the mutual elements of a contract but when accepted by the optionee, there emerges, as the result of such acceptance, an executory contract, inter partes, with the optionor as the vendor and the optionee as the vendee, for the sale and purchase of the optioned property, mutually binding upon the optionor and optionee and containing mutual rights and obligations enforcible as such in accordance with the established rules relating to executory contracts.''

An option is a unilateral undertaking lacking the mutual elements of a contract. It confers a privilege or right to elect to buy, but it does not impose any obligation to buy. It is defined as an agreement by which one binds himself to perform a certain act, usually to convey property, for a stipulated price within a designated time leaving it to the discretion of the person to whom the option is given to accept upon the terms specified and there is no liability to perform the specified act until the person to whom the offer has been made has accepted it according to its terms. (12 Am. Jur. 524, 525.) In the absence of an express limitation of time in an option the offer may be made under circumstances which raise an implied limitation of the time of the continuance of the offer. The usages or custom

of trade may likewise raise an implied limitation and in the absence of an express limitation or of circumstances creating an implied limitation, or usages or custom of trade, the offer continues for a reasonable time. (12 Am. Jur. 548.)

In *Larmon v. Jordan,* 56 Ill. 204, the opinion quotes Parsons on Contracts, Vol. 1, 405, 406, as follows: (p. 207) "If the proposer fixes a time, he expresses his intention, and the other party knows precisely what it is. If no definite time is stated, then the inquiry as to a reasonable time resolves itself into an inquiry as to what time it is rational to suppose the parties contemplated; and the law will decide this to be that time which, as rational men, they ought to have understood each other to have had in mind." In *Hamilton v. Scully,* 118 Ill. 192, 198, the court quoted from 2 Chitty on Contracts, 11 Am. Ed. 1062, as follows: "Where a party to a contract undertakes to do some particular act, the performance of which depends entirely on himself, and the contract is silent as to the time of performance, the law implies an engagement, that it shall be executed within a reasonable time, without reference to extraordinary circumstances." Such is the holding in *Estate Stove Co. v. Kenney,* 234 Ill. App. 366.

Applying the foregoing legal principles to the facts as they appear in this record, it is apparent that the decree of the lower court was erroneous for two reasons. First, appellant granted appellee an option or privilege to purchase 250 shares of stock in block of 50 shares each upon the payment to the company of $500 for each block. When advised of this action by the company, she declined to accept it. Her declination of the offer as made left the matter as if no offer had been made. Her counter-offers or proposals were both rejected by the company. This, too, left the matter as if no offer had been made. Second, if, how-

ever, appellee had not rejected the offer as submitted to her, she was required to accept the offer as made within a reasonable time. This she did not do. It was not until February 21, 1947, that her attorneys informed appellant of the acceptance and tendered the purchase price of the stock. This was not a reasonable time under the facts and circumstances disclosed by this record.

Counsel for appellant cite *Estate Stove Co. v. Kenney,* 234 Ill. App. 366, which holds that where an offer is silent as to the time within which it is to be accepted, it must be accepted within a reasonable time after the offer is made and if an offer is not accepted within a reasonable time the person making the offer has the right to presume that it is rejected. Counsel for appellee agree that this is a correct statement of the law but argue that in the instant case an offer was made by appellant to appellee on February 26, 1942, to purchase any number of shares she desired at $10 per share and it is that offer which counsel insist she accepted and calls our attention to the portion of the minutes of the meeting of the board of directors of appellant which recites that appellee "had decided to take 250 shares." Counsel insists that the minutes of the meetings of the board of directors held on February 26, 1942, and April 30, 1942, when considered together show an offer on the part of appellant and an acceptance on the part of appellee and "make a mutual valid, binding contract and it was no longer an option." Counsel overlook a portion of these minutes which recite: "Mr. S. E. Hyer made a motion the above privilege be granted and it was passed unanimously by the board." What was the above privilege? The minutes of April 30, 1942, answer, "to take 250 shares at a par value of $10.00 per share; the stock to be issued to her in blocks of 50 shares each *upon the payment to the*

*company of $500.00 for each block."* At no time thereafter did appellee ever offer to pay appellant $500 or any other sum until her counsel, on February 21, 1947, mailed appellant a cashier's check for $2,500 and demanded the issuance of 250 shares of stock.

During the period of time intervening between April 30, 1942, and February 21, 1947, appellant had had a substantial growth. Its business had expanded, and its earnings and the value of its stock had greatly increased. The law is that where there has been a material advance in the price of property covered by an option, unexplained delay in exercising the option will defeat the right to specific performance. (*Stuckrath v. Briggs & Turivas,* 329 Ill. 555, 566; *Harry Manaster & Co. v. Young,* 302 Ill. App. 545, 555.) What is a reasonable time in which to exercise an option depends upon the facts and circumstances of each particular case. (*Hagan v. Dundore,* a Maryland case, reported in 160 A.L.R. 517, 43 A. (2d) 181, and cases there cited.) Under the facts and circumstances shown by this record, appellee did not exercise her option within a reasonable time.

All appellee ever did under the resolution of February 26, 1942, was to indicate the number of shares she desired to purchase. Under the resolution of April 30, 1942, she declined to accept the portion thereof which required her to pay $10 per share for the stock until her counsel, on February 21, 1947, sent appellant a cashier's check for $2,500. Just what occurred in February 1947, to cause appellee to tell the then president of the company that she could pick up the stock and pay for it at that time does not appear.

Under the facts as disclosed by this record, appellee within a short time after appellant extended to her an option to purchase any of its stock either in February 1942, or April 1942, rejected that offer and

269

declined to purchase the stock. Assuming that she did not decline to purchase the stock and that the offer remained open for a reasonable time thereafter, laches is a complete defense to the relief sought. The chancellor erred in not so finding.

The decree of the circuit court of Winnebago county is reversed and the cause is remanded to that court with directions to enter an order dismissing the complaint for want of equity.

*Reversed and remanded with directions.*